221 F.3d 293 (2nd Cir. 2000)
 KENNETH E. WHITE, Plaintiff-Appellant,
v.
ABCO ENGINEERING CORP., Defendant-Cross-Claimant-Defendant-Appellee,
HAMM'S SANITATION, INC., Defendant-Cross-Claimant-Appellant,
H.S.S. RECYCLING, INC. and H.S.S., INC., Third-Party-Defendants.
 Docket Nos. 99-9458(L), 99-9462(CON)
August Term, 1999
 UNITED STATES COURT OF APPEALS
SECOND CIRCUIT
 Argued May 15, 2000
Decided Aug. 15, 2000
 
 Appeal from summary judgment entered in the United States District Court for the Southern District of New York (Parker, J.) in a products liability action, the court having concluded that the defendant-appellee conveyor manufacturer could not be held strictly liable for a defective design because the accident giving rise to the action was the result of a subsequent alteration of the conveyor not made by the manufacturer, and having rejected without explanation a failure to warn claim.
 Affirmed in part; vacated and remanded in part.[Copyrighted Material Omitted]
 JOHN S. SELINGER Levinson, Zeccola, Reineke, Ornstein & Selinger, P.C. Central Valley, New York, for Plaintiff-Appellant.
 PHILLIP A. TUMBARELLO Wilson, Elser, Moskowitz, Edelman & Dicker LLP New York, New York (Rosario M. Vignali, New York, New York, on the brief), for Defendant-Cross-Claimant-Defendant-Appellee.
 THOMAS R. NEWMAN Luce, Forward, Hamilton & Scripps, LLP New York, New York, for Defendant-Cross-Claimant-Appellant.
 Before: CARDAMONE, MINER, and WALKER, Circuit Judges.
 MINER, Circuit Judge:
 
 
 1
 Plaintiff-appellant Kenneth E. White ("White") and defendant-cross-claimant- appellant Hamm's Sanitation, Inc. ("Hamm's") appeal from a summary judgment entered in this products liability action by the United States District Court for the Southern District of New York (Parker, J.) in favor of defendant-cross-claimant-defendant-appellee ABCO Engineering Corporation ("ABCO"). White was severely injured in an accident at his workplace on April 5, 1995. He brought suit against ABCO, the manufacturer of two conveyors used by his employer in recycling operations, alleging that the conveyors ABCO sold to White's employer, H.S.S., Inc. ("HSS"), were defectively designed and had inadequate warnings, thereby subjecting ABCO to strict liability. The district court granted summary judgment in favor of ABCO with respect to the design defect claim on the ground that a four-inch hole cut in a guard running along the side of one of the ABCO conveyors after the sale constituted a substantial modification of the conveyor and was the proximate cause of the accident. The court also dismissed, without explanation, the failure to warn claim.
 
 
 2
 For the reasons that follow, we affirm in part and vacate in part the judgment of the district court and remand for additional proceedings consistent with this opinion.
 
 BACKGROUND
 
 3
 At all times pertinent to this appeal, HSS was a New Jersey solid waste management company that owned and operated several recycling plants that separated aluminum cans, plastic soda bottles, and other recyclables. The recyclables were delivered to HSS by Hamm's, a New Jersey solid waste hauler that collected residential and commercial waste. Ambrose Hamm was the CEO of HSS and the President of Hamm's.
 
 
 4
 In the spring of 1990, HSS decided to create a new system for sorting recyclable materials. To this end, HSS purchased two conveyors from ABCO. One conveyor was a horizontal 40-foot channel frame or picking line conveyor ("line conveyor"). The other conveyor was a 15-foot cleated belt incline conveyor ("incline conveyor"). When the line conveyor was sold, it was equipped with a "tail guard" that was mounted at the nip or tail portion of the conveyor. The tail portion of the conveyor is located at the opposite end of the conveyor from the motor and contains a pulley that the belt moves around. Because the belt is pulled around the pulley, forming a nip point, the tail portion is a dangerous part of the machine. See Jurado v. Western Gear Works, 131 N.J. 375, 380 (1993) ("since 1948 design engineers have recognized the potential danger posed by nip points"); Johnson v. Salem Corp., 97 N.J. 78, 86 (1984) (discussing the testimony of the plaintiff's expert with regard to "the dangerous nip point"). The tail guard is a metal guard that covers the tail end of the machine and contains a slight wraparound of the sides of the machine immediately adjacent to the tail end of the line conveyor. As sold, this guard blocked access to the nip point at the tail end of the machine as well as at each side of the line conveyor abutting the tail end.
 
 
 5
 ABCO shipped the incline and line conveyors to HSS without side guarding along the length of the machine and without chute work. Side guards serve two purposes: (1) retaining and confining materials on the belt conveyors so materials do not spill off and (2) protecting workers from contact with the belt and supporting rollers, as well as the turnaround pulley located beneath the tail guard. Chute work connects the incline and line conveyors, permitting the smooth transfer of materials from the incline conveyor to the line conveyor. Both chute work and side guards were available from ABCO at an additional cost, but were not purchased by HSS. Due to the absence of side guards, there was open access to the rollers along the length of the line conveyor. Access to the nip point was also possible from the side, except for the portion of the sides that were covered by the wraparound portion of the tail guard. It is unclear exactly how far the wraparound portion of the tail guard extended along the side.
 
 
 6
 Numerous warning labels were affixed to the ABCO conveyors. Some of these labels read as follows: "DO NOT OPERATE THIS MACHINE WITHOUT GUARDS IN PLACE" and "STOP ENGINE OR DISCONNECT POWER, AND WAIT FOR ALL MOVEMENT TO STOP BEFORE CLEANING, INSPECTING OR REPAIRING MACHINE." The conveyors also contained a graphic depiction of a hand being caught between rollers. Also, underneath the tail guard was a warning, in orange and black lettering, reading as follows: "!WARNING . . . IF YOU CAN READ THIS THE GUARD HAS BEEN REMOVED. DO NOT OPERATE THE MACHINE UNTIL GUARD IS REPLACED."
 
 
 7
 After purchasing the conveyors from ABCO, HSS fabricated a heavy wire mesh side guard running the full length of the line conveyor to protect workers, as well as chute work to deposit material from the incline conveyor onto the line conveyor. HSS also fabricated bins, hoppers, supports, and an electrical on/off control for the recycling machine it assembled from the conveyors. The conveyors were assembled by HSS so materials could be recycled on the flatbed of a tractor trailer.[1] The configuration of this outdoor recycling system required material to be fed into the head or drive end of the line conveyor, where the motor was located, and discharged off the tail pulley end. This configuration necessitated the removal of the ABCO-installed tail guard, as the guard would have obstructed material that was to be discharged from the tail pulley end of the line conveyor. ABCO was not consulted about either the configuration or the installation of the recycling system designed by HSS.
 
 
 8
 In the spring of 1992, HSS decided to dismantle the outdoor recycling system and move certain components of the system (including the conveyors) to an indoor facility in Wantage Township, New Jersey. The indoor system was designed and installed by HSS, Ambrose Hamm, the engineering firm BSE, and an electrical contractor. The purpose of the new indoor system was to permit increased volume and profit from recycling. Ambrose Hamm instructed one of his employees to set up the interior system so it would incorporate the old ABCO conveyors. HSS also purchased a new control panel. In contrast to the outdoor system, the indoor system was set up to run with material being fed from the incline conveyor belt onto the tail end of the line conveyor and then discharged off the drive or motor end of the line conveyor.
 
 
 9
 When the conveyors were set up inside the Wantage plant, the tail guard was not replaced. However, HSS had Hamm's install a new solid steel side guard that replaced the wire mesh guard. This solid steel guard covered portions of the line conveyor originally blocked by the removed ABCO tail guard as well as portions that would have been covered by the absent ABCO side guard. Around this time, someone used a blow torch to cut a four-inch hole in the steel side guard, in the area where the original ABCO tail guard and the absent ABCO side guard would have intersected. It is unclear who cut this four-inch hole in the guarding along the length of the machine or exactly where this hole was located. Apparently this hole was cut because recyclables would become stuck in the nip point, causing the belt to go off track, and because the rollers inside the conveyor would sometimes need to be moved for belt adjustments.
 
 
 10
 In November 1994, HSS hired White as a line operator in the Wantage plant. White's job required him to stand on either side of the line conveyor, along with other HSS employees, and pick and separate recyclable material. He received $5.50 per hour for his work.
 
 
 11
 According to White, recyclables, before being picked, would often fall from the top of the line conveyor to the bottom or return portion of the belt and get caught in the nip point between the return belt and the tail pulley at the end of the line conveyor. When this occurred, the belt would move off track. White had seen the line supervisor and others, without shutting off the machine, reach into the four-inch hole that had been cut in the HSS side guard and retrieve items caught in the nip point that were causing the belt to go off track.
 
 
 12
 On April 5, 1995, White noticed that a bottle was caught between the lower belt and the pulley. He reached through the access hole in the side barrier guard somewhere near the tail end of the line conveyor to remove the bottle. White's glove became caught in one of the rollers that pulled the conveyor and he was pulled in. The roller crushed his hand and arm. A fellow employee switched off the belt operation when White started yelling. However, the injury was severe, and White's arm had to be surgically amputated below the elbow.
 
 
 13
 White subsequently applied for and continues to receive workers' compensation benefits. On August 9, 1995, White sued ABCO in the United States District Court for the Southern District of New York. White alleged that the ABCO conveyor was "defectively and dangerously manufactured and designed, was not properly guarded, was not properly inspected and tested, did not have proper instructions and warnings; and further, that [ABCO] failed to give proper instructions, notice and warnings of all dangers . . . or potential . . . hazards." He sought recovery in negligence and strict liability, both in the amount of $10 million. On March 11, 1996, ABCO impleaded H.S.S. Recycling, Inc.,[2] Hamm's, and HSS as third-party defendants. On or about January 2, 1997, White amended his complaint to name Hamm's as a direct defendant. Around this time, Hamm's asserted cross-claims against ABCO for contribution and indemnity. Additionally, on or about April 2, 1997, White commenced a separate but related action against Hamm's in the United States District Court for the District of New Jersey.
 
 
 14
 By motion filed January 21, 1997, HSS sought summary judgment, contending that it was protected from liability under the New Jersey Workers' Compensation statute. By motion filed February 19, 1997, ABCO also sought summary judgment. By motion also filed February 19, 1997, Hamm's sought dismissal of the action, asserting that the district court in New York did not have in personam jurisdiction over it. On July 7, 1997, the district court denied ABCO's and Hamm's motions and granted HSS' motion.
 
 
 15
 The court began its ruling by detailing the salient facts. It characterized the first issue before the court as whether "the affidavit of plaintiff's expert, Jeffrey Ketchman, create[d] a genuine issue of material fact with respect to whether the [line] conveyor would have caused the injury notwithstanding the conveyor's subsequent modification." After stressing its "responsibility not to resolve factual issues," the court found that although the machine was substantially modified, there was a question whether the modification was the proximate cause of the accident. The court relied on Ketchman's affidavit and determined that there was a genuine issue of material fact whether "the accident would have occurred even if the tail guard had been in place." The court accepted HSS' claim of immunity from suit under the New Jersey Workers' Compensation statute and rejected Hamm's claim of immunity under the same provision.[3]
 
 
 16
 In October 1997, ABCO sought reargument of the summary judgment question. ABCO contended that the district court's July ruling "incorrectly focused on the manner in which the accident could theoretically have happened, as opposed to the manner in which the undisputed testimony showed the accident in question actually happened." ABCO asserted that although Ketchman's affidavit spoke in terms of access to the nip point being possible even with the tail guard in place, he was talking about access from the "front," not the "side" where White actually reached in. ABCO also argued that the alterations made by HSS and Ambrose Hamm to the recycling system relieved it of liability.
 
 
 17
 On November 24, 1997, the court granted ABCO's motion for summary judgment. The court agreed with ABCO that the proximate cause of the accident was the material alteration of the recycling machine caused when the hole was cut with a blowtorch in the side guard of the line conveyor near the tail end. The court found that White admitted that he was hurt when he reached through the hole "cut in the side guard." In so holding, the court significantly relied upon the decision of the New York Court of Appeals in Robinson v. Reed-Prentice Division of Package Machinery Co., 49 N.Y.2d 471 (1980), which it interpreted as finding that a manufacturer is only responsible for designing a product that is safe at the time of sale. The court extensively quoted Robinson, stating in relevant part, "[m]aterial alterations at the hands of a third party which work a substantial change in the condition in which the product was sold by destroying the functional utility of a key safety feature, however foreseeable that modification may have been, are not within the ambit of a manufacturer's responsibility."
 
 
 18
 White then sought reconsideration, which resulted in a superseding opinion, dated January 26, 1998. In this opinion, the court stated that its July decision had incorrectly focused on the affidavit of Ketchman, White's expert. According to the court, Ketchman's affidavit concluded that the line conveyor was defectively designed, but based that conclusion on the improper premise that the accident occurred when White reached in from the "front" instead of from the side. The court also stated that the proximate cause of the accident was the substantial modification made to the conveyors when "someone other than ABCO" cut the four-inch hole in the side guard. After again citing to Robinson, the court addressed White's contention that New Jersey law should apply.
 
 
 19
 The court found it unnecessary to decide which state's law applied, finding the result the same under either New York or New Jersey law. The court also quoted language from Brown v. United States Stove Co., 98 N.J. 155, 166, 174-75 (1984), to the effect that misuse of a product by a consumer can insulate a manufacturer from strict liability under New Jersey design defect law. The court concluded as follows:
 
 
 20
 Plaintiff fails to provide any evidence that either the tail guard or ABCO side guards would have prevented the subsequent alteration of the conveyor by someone other than ABCO, specifically, the four-inch hole cut with a blowtorch through the side safety guards through which plaintiff reached in and was injured. As in Brown, even if issues for the jury remained on the issues of the foreseeability of the removal of the tail guard and sale of the conveyor without ABCO side guards, the cutting of the hole in the side of the conveyor was the independent cause of the accident for which ABCO is simply not responsible.
 
 
 21
 The district court rejected the failure to warn claim without explanation.
 
 
 22
 On January 9, 1998, White and Hamm's had stipulated that the direct action between them would be transferred to the United States District Court for the District of New Jersey, where, as noted above, an action brought by White against Hamm's was already pending. See White v. ABCO Eng'g Corp., 199 F.3d 140, 142-43 & n.3 (3d Cir. 1999). By consent of both parties, the district court in New Jersey entered judgment in favor of White against Hamm's for $600,000 on June 16, 1998. White and Hamm's then filed an appeal to the Third Circuit from the summary judgment decision of Judge Parker in the Southern District of New York and Hamm's appealed to the Third Circuit from the judgment entered in the District of New Jersey. The Third Circuit issued an opinion transferring all appeals to this court. See id. at 145. On October 8, 1998, Judge Parker entered an order dismissing with prejudice "all claims and cross-claims and counterclaims, however designated, against ABCO." Appeals were also filed in this court by White and Hamm's.
 
 DISCUSSION
 
 23
 On appeal, White contends that the district court erred in holding that the alterations made to the recycling machine after it was sold, in particular, the blow torched hole, insulated ABCO from liability. In support of his contention, White argues that the district court (1) incorrectly applied New York instead of New Jersey law; (2) mistakenly accepted ABCO's material alteration defense, even though the hole was cut in a side guard supplied by Hamm's; (3) improperly granted summary judgment despite the presence of genuine issues of material fact concerning alteration and causation; and (4) failed to address his failure to warn claim, purportedly because the court was under the impression that the failure to warn claim was precluded by the "material alteration" theory. Hamm's agrees with White that New Jersey law applies, that the jury should have been allowed to decide the design defect issues, and that the failure to warn claim should have survived even if the design defect theory lacked merit.
 
 
 24
 In response to these arguments, ABCO asserts that the district court's resolution of the summary judgment question was correct. It contends that (1) under either New Jersey or New York law, the ABCO product was materially altered in a way that eliminates ABCO's possible liability for any design defects at the time of manufacture; (2) the failure to warn claim lacks merit; and (3) Hamm's waived its right to pursue this appeal by failing to oppose ABCO's motions for summary judgment.
 
 The Standard of Review
 
 25
 We review de novo the district court's grant of summary judgment, construing the evidence in the light most favorable to the appellants and drawing all reasonable inferences in their favor. See Brown v. C. Volante Corp., 194 F.3d 351, 354 (2d Cir. 1999); Wilkinson v. Russell, 182 F.3d 89, 96 (2d Cir. 1999). In evaluating a grant of summary judgment, we consider whether there is a "genuine issue as to any material fact, and the movant is entitled to judgment as a matter of law." Kelly v. City of Mount Vernon, 162 F.3d 765, 768 (2d Cir. 1998). Our inquiry focuses on whether the district court correctly applied the substantive law and whether, viewing the evidence in the light most favorable to the plaintiff, there are any genuine issues of material fact necessitating a trial. See, e.g., King v. Crossland Sav. Bank, 111 F.3d 251, 256 (2d Cir. 1997). "Only when no reasonable trier of fact could find in favor of the nonmoving party should summary judgment be granted." Taggart v. Time Inc., 924 F.2d 43, 46 (2d Cir. 1991).
 
 
 26
 In evaluating the district court's interpretation and application of state law in a products liability action, we accord the district court no deference. See Salve Regina College v. Russell, 499 U.S. 225, 231 (1991); Pahuta v. Massey Ferguson, Inc., 170 F.3d 125, 132 (2d Cir. 1999) (reviewing de novo a district court's determination of New York law regarding a manufacturer's strict liability for a product with design defects); McCarthy v. Olin Corp., 119 F.3d 148, 153 (2d Cir. 1997) ("We determine de novo what the law of New York is."). We also decide choice of law questions de novo. See Curley v. AMR Corp., 153 F.3d 5, 11 (2d Cir. 1998); Sheldon v. PHH Corp., 135 F.3d 848, 852 (2d Cir. 1998). In this case, we determine that New Jersey products liability law applies, and that, on the record before us, triable factual issues remain to be resolved.
 
 The Applicable Law
 
 27
 The district court did not definitively resolve this issue, finding that under either New York or New Jersey law, summary judgment was appropriate. Before us, White and Hamm's argue that New Jersey law applies and contend that the laws of both New York and New Jersey require reversal. ABCO proceeds along the path taken by the district court, arguing that under either state's law, the district court was correct to grant summary judgment.
 
 
 28
 In this diversity action, we apply New York conflict of law principles. See Celle v. Filipino Reporter Enters. Inc., 209 F.3d 163, 175 (2d Cir. 2000). New York courts formerly employed the "traditional, 'territorially oriented' approach to choice of law issues, which applied the law of the geographical place where one key event occurred, such as the place of the wrong in tort cases or where an agreement was entered into or performed in contract cases." Istim, Inc. v. Chemical Bank, 78 N.Y.2d 342, 347 (1991). More recently, however, New York courts have recognized that "[a] State may lack sufficient nexus with a case so that choice of its law is arbitrary or fundamentally unfair," and have abandoned these rigid rules in favor of a more flexible approach. Cooney v. Osgood Mach., Inc., 81 N.Y.2d 66, 70 71 (1993); see Istim, 78 N.Y.2d at 347. Under this more flexible "interest analysis" approach, New York courts seek to apply the law of the jurisdiction with the most significant interest in, or relationship to, the dispute. AroChem Int'l, Inc. v. Buirkle, 968 F.2d 266, 270 (2d Cir. 1992); see Babcock v. Jackson, 12 N.Y.2d 473, 481 82 (1963).
 
 
 29
 "In deciding which state has the prevailing interest, we look only to those facts or contacts that relate to the purpose of the particular laws in conflict. 'Under this formulation, the significant contacts are, almost exclusively, the parties' domiciles and the locus of the tort.'" AroChem Int'l, 968 F.2d at 270 (quoting Schultz v. Boy Scouts of America, Inc., 65 N.Y.2d 189, 197 (1985)). "If conflicting conduct regulating laws are at issue, the law of the jurisdiction where the tort occurred will generally apply because that jurisdiction has the greatest interest in regulating behavior within its borders." Cooney, 81 N.Y.2d at 72.
 
 
 30
 New Jersey products liability law governs this dispute. Only one of the parties, White, is a New York resident, and all of the pertinent events in the case transpired in New Jersey.[4] Additionally, since this case involves an industrial accident and issues of worker safety, New Jersey has a special interest in having its law apply. See id. The overall circumstances of this case indicate that New Jersey has the most significant interest in resolving this dispute. See Babcock, 12 N.Y.2d at 481-82.
 
 Design Defect Theory
 
 31
 Under New Jersey law, a plaintiff proceeding in a products liability case on a design defect theory bears the burden of proving "by a preponderance of the evidence that the product causing the harm was not reasonably fit, suitable or safe for its intended purpose." N.J. Stat. Ann. § 2A:58C-2 (West 2000). The focus in a design defect case is on the product, not the conduct or negligence of the product's manufacturer. See Myrlak v. Port Auth. of New York & New Jersey, 157 N.J. 84, 96 (1999) (citing Prosser & Keeton on Torts § 99, at 695 (5th ed. 1984)). The manufacturer's duty is to ensure that the product it places into the stream of commerce is safe when used for its intended purposes. See § 2A:58C-2.
 
 
 32
 The plaintiff must establish (1) a design defect in a product that (2) existed when the product left the defendant's control and (3) injured a reasonably foreseeable user. See Myrlak, 157 N.J. at 97; Feldman v. Lederle Labs., 97 N.J. 429, 449 (1984); Michalko v. Cooke Color & Chem. Corp., 91 N.J. 386, 394 (1982). At its core, the analysis focuses on "whether the manufacturer acted in a reasonably prudent manner in designing . . . a product." Zaza v. Marquess & Nell, Inc., 144 N.J. 34, 49 (1996).
 
 
 33
 To prove both the existence of a defect and that the defect existed while the product was in the control of the manufacturer, a plaintiff may resort to direct evidence, such as the testimony of an expert who has examined the product, or, in the absence of such evidence, to circumstantial proof. . . . Proof that a product is not fit for its intended purposes "requires only proof . . . that 'something was wrong' with the product."
 
 
 34
 Myrlak, 157 N.J. at 98 (quoting Scanlon v. General Motors Corp., 65 N.J. 582, 591 (1974)). Additionally, the age and usage of a product are relevant in assessing whether a defect existed as sold; it is more difficult to show that an older product had a defect when sold. See id.
 
 
 35
 With these general principles in mind we turn to the disputed issues. White and Hamm's assert that the hole cut in the side of the machine does not insulate ABCO from liability because there is sufficient evidence for a jury to conclude that the machine was unreasonably dangerous when sold. ABCO cites a series of cases to the effect that material alterations to a machine preclude manufacturer liability, especially when those alterations defeat a key safety feature that would have prevented the accident in question.
 
 
 36
 The Supreme Court of New Jersey has recently decided a case involving a manufacturer's potential strict liability for possible defects in a component of a machine that was substantially altered at the time of the accident giving rise to the suit. See Zaza v. Marquess & Nell, Inc., 144 N.J. 34 (1996). In Zaza, hot molten water and carbon from a quench tank owned by Zaza's employer, Maxwell House Coffee, overflowed and caused second-degree burns to Zaza's back, arms and upper extremities. See id. at 42. The quench tank was part of "a large, complex manufacturing process . . . used to produce decaffeinated coffee beans." Id. The overall machine contained a multiple hearth furnace and numerous pipes, water screws, scrubbers and fans, as well as the quench tank. The tank was made of stainless steel with holes in it. See id. at 43. The defendant metal fabricator, International, built the allegedly defective quench tank to design specifications created by Maxwell House and an outside engineering firm. Another company, Brennan, then assembled and integrated the entire system.
 
 
 37
 The final design specifications for the machine incorporated three safety devices intended to avoid an overflow of molten liquid from the quench tank. See id. Nevertheless, none of the safety devices had been installed when the plaintiff was injured. Zaza filed suit against all of the involved parties, asserting design defect and failure to warn claims sounding in strict liability, and the case proceeded to summary judgment before the trial court. See id. at 44. Brennan and another defendant settled the case. Brennan had claimed that it omitted the safety devices recommended by the outside engineering firm at Maxwell House's behest. See id.
 
 
 38
 The trial court granted summary judgment to International, reasoning that International had properly manufactured the component metal part and was not responsible for the condition of the system when it was finally assembled. See id. at 45. The court also rejected the failure to warn claim, finding that International had no way to know what warnings were appropriate without knowing how its component would finally be integrated into the machine. See id. at 46. The New Jersey Appellate Division reversed, stating:
 
 
 39
 [International] had a duty to furnish a safe product, the breach of which triggers strict liability. . . . The fact that defendant may have understood that Maxwell House would install the safety device in the holes it cut did not relieve defendant from potential liability. . . . That fact only relates to the issues of proximate cause.
 
 
 40
 Id.
 
 
 41
 On appeal, the Supreme Court of New Jersey first focused on the duty of a manufacturer that produces a non-defective part to ensure that the final system properly incorporates that component part. See id. at 47. The court rejected the proposition that there was absolute immunity from liability for component part manufacturers, finding that a manufacturer may not place unreasonably dangerous products into the stream of commerce and, instead of installing feasible safety devices, merely rely on an expectation that someone else will do so. The court recognized that normally a component manufacturer is not strictly liable for injuries caused by a component part that has been subject to "substantial change" from the condition in which it was sold. However, the Supreme Court of New Jersey quoted with approval a Fifth Circuit decision holding that a manufacturer "'is not liable for defects in the final product if the component part itself is not defective.'" Id. at 53 (quoting Koonce v. Quaker Safety Prods. & Mfg, 798 F.2d 700, 715 (5th Cir. 1986)) (emphasis supplied). The question then becomes: is the component part itself defective?
 
 
 42
 The court then turned to the facts relevant to International's possible liability. It concluded that International had no duty to install the safety devices on the quench tank when it left International's control. The court found that there was no allegation that the quench tank had a manufacturing defect. It stated: "The quench tank was not in and of itself dangerous or defective. It was a sheet metal tank with holes in it." Id. at 55. Moreover, the court determined that it was not practical or feasible for International to install the needed safety devices in the quench tank; rather, the safety devices needed to be attached after the component metal part had been incorporated into the overall system. See id. The court also relied on the fact that the quench tank was substantially altered when it was incorporated into the coffee bean decaffeination system. Before that, "the quench tank was merely an isolated unoperative component" that did not pose any danger. Id. at 56. The court summed up its analysis by stating that
 
 
 43
 [i]t was not defendant's failure to attach the safety devices in the quench tank that caused plaintiff's injury. Defendant did exactly what it was paid $7,400 to do; its sole obligation was to produce a component part that was safe and satisfactory according to the specifications provided by Maxwell House. It did that. Under those circumstances, we find that International is not strictly liable for its failure to install the safety devices on the quench tank.
 
 
 44
 Id. at 57 (emphasis supplied). Consequently, the court affirmed the trial court's grant of summary judgment on the design defect claim. Additionally, the court affirmed the summary judgment in favor of International on the failure to warn claim on the basis that International had no duty to warn Zaza about the alleged dangers of the overall system.
 
 
 45
 Zaza reveals the proper approach to the material alteration theory under New Jersey law. Contrary to ABCO's view, material alteration alone is not a defense; rather, material alteration is only a defense when the alteration makes it impossible to conclude that a defect at the time of manufacture was a cause of the injury giving rise to the suit. In Zaza, the Supreme Court of New Jersey recognized that the sheet of metal fabricated by International had undergone substantial changes by the time the injury occurred. Nevertheless, this was not the ultimate basis for its affirmance of the trial court's grant of summary judgment. Instead, the court relied upon its determination that "[t]he quench tank was not in and of itself dangerous or defective." Id. at 55.
 
 
 46
 In our case, we cannot conclude as a matter of law that the ABCO line conveyor as a recycling machine component was safe as sold without side guards. Accordingly, we find that the district court's grant of summary judgment in favor of ABCO on that basis was error. The district court's opinion granting ABCO summary judgment failed to accord the affidavit of White's expert, Ketchman, its proper significance, and consequently failed to recognize the existence of genuine issues of material fact requiring resolution by a jury. Ketchman, a specialist in industrial accident reconstruction and safety, stated in his affidavit that ABCO's line conveyor, as sold, "allowed access for both conveyed materials and workers' hands to the nip area inside the conveyor belt in front of the tail-end pulley" because it lacked a proper side guard. (emphasis in original). He asserted that the tail guard that ABCO placed on the conveyor was insufficient because it "did not block both front and side access at the tail-end" and "was not used in conjunction with a properly designed side barrier guard." Although the district court's July 7, 1997 opinion relied on this affidavit to find that there were genuine issues of material fact precluding summary judgment, the district court later accepted ABCO's argument that Ketchman's opinion was irrelevant because White was injured when he reached through the side guard fabricated by Hamm's.
 
 
 47
 The district court interpreted in one way the meaning of the language in Ketchman's affidavit. However, that language is subject to two interpretations. Although Ketchman's affidavit spoke in terms of side and front access to the nip area of the line conveyor, the term "front" may have referred to the area in front of the nip point, but beyond the coverage of the removed tail guard. The term "side" apparently referred to the area along the entire length of the conveyor. When viewed through this lens, the affidavit posits that although the tail guard blocked access to the nip area directly from the side at the end of the machine, it was still possible for someone to reach back toward the nip area from along the side of the machine slightly in front of the nip area and away from the area protected by the tail guard. The affidavit is at least ambiguous in this regard. This is especially so because the testimony of White is uncertain as to where White reached his hand into the machine to retrieve the bottle. See infra.
 
 
 48
 We find no inconsistency between the deposition given by Ketchman and the later affidavit. Although it is generally accepted that a later affidavit may not supersede a prior deposition, that rule only applies when the deposition and affidavit conflict. See Rule v. Brine, Inc., 85 F.3d 1002, 1011 (2d Cir. 1996) (holding that when subsequent sworn testimony "amplifies or explains, but does not merely contradict" prior testimony, a party may show that a triable issue of fact exists). In his deposition testimony, Ketchman was asked whether the tail guard "would have covered the nip point into which the Plaintiff's hand became caught." He replied that it would have covered the area "on the side, . . . but not from the front." Counsel for ABCO then rephrased her question and Ketchman stated that if the tail guard was still on the machine at the time of the accident, "[i]t would have blocked [White] from reaching directly in from the side, but . . . not necessarily from the front." Ketchman's testimony demonstrates that White could have reached into the line conveyor at a point slightly in front of the side portion that would have been covered by the tail guard. If this is in fact where White was injured, then Ketchman's testimony and affidavit show that the injury may have been the result of a defective design by ABCO in failing to sell the line conveyor with a properly installed side guard. The cutting of the hole in the fabricated side guard would have merely restored the claimed defective design, i.e., the unguarded sides of the line conveyor.
 
 
 49
 Ketchman's later affidavit was consistent in this regard. The affidavit merely clarified his earlier deposition testimony by indicating that the tail guard did not properly block access for "workers' hands to the nip area inside the conveyor belt in front of the tail-end pulley." (emphasis omitted). The logistics of the line conveyor required that all access to the nip point by a worker come in some sense from the side. Nothing provided to us is conclusive on the question of whether the hole cut in HSS' side guard was in an area originally covered by the ABCO tail guard or in an area left open and dangerous by the absence of an ABCO side guard.
 
 
 50
 This analysis also would answer ABCO's contention that, if the tail guard had not been removed, it would have prevented the accident, and that consequently the four-inch hole was the proximate cause of the accident. It is possible that ABCO is correct that the hole was made in the area of the machine originally blocked by the tail guard, and that the material alteration consisting of the removal of that guard constituted the proximate cause of the accident. However, we cannot conclude that this possibility has been established as undisputed fact. Another possibility, equally tenable on the record before us, is that the hole was cut in the area along the side of the conveyor that was left unsecured by any ABCO guarding at the time of sale. If that were indeed the case, then the cutting of the hole would merely have returned the conveyor to the condition in which ABCO sold it and ABCO might be held strictly liable for a design defect. Under such circumstances, it would be for a jury to decide whether the absence of ABCO side guarding rendered the line conveyor unreasonably dangerous and whether that danger was the proximate cause of White's injury.
 
 
 51
 Of major importance is the factual question raised by White's deposition testimony regarding the location where he reached in to retrieve the bottle. In his deposition, White testified that workers would reach into the hole in the steel side guard to remove objects stuck in the nip point. He was then asked to "describe where that spot [wa]s." He replied as follows: "Okay. You got where it [the incline conveyor] comes upstairs, it drops down to our belt, and it's about two foot up on our belt on the side, okay, of the whole setup. I don't know." Then later in his deposition in describing where exactly inside the machine he stuck his hand, he stated that he placed his left arm in the hole, but it could not reach into the location where the bottle was stuck in the nip point. Consequently, he "put [his] right arm in and [he] had to stretch for it." When asked how far in he inserted his left arm, he replied that he had put his arm in as far as it would go, which was only up to the elbow because the hole was too small to get his shoulder through the hole.
 
 
 52
 This testimony also suggests that White may have reached in at a point that would not have been covered by the removed tail guard. ABCO's expert, Mr. Schwalje, recognized this uncertainty in an affidavit that he supplied. Although he was adamant in his opinion that the tail guard would have prevented the accident, he phrased his testimony as follows: "As supplied by ABCO the conveyor was provided with tail pulley area barrier guarding which would unquestionably have prevented Mr. White's access to the belt/terminal pulley area as it was reported to have occurred." (Emphasis supplied).
 
 
 53
 After extensively reviewing the evidence submitted by the parties, we conclude that the component part manufactured by ABCO, the line conveyor, in contrast to the sheet metal produced by International in Zaza, may very well have been unreasonably dangerous as sold and that the defective and unsafe conveyor may have been the proximate cause of plaintiff's injury. Accordingly, we vacate the grant of summary judgment insofar as it relieves ABCO of liability for a potential design defect and remand.
 
 Failure to Warn
 
 54
 White and Hamm's argue that the district court failed to address this meritorious claim. Both appellants cite Liriano v. Hobart Corp., 92 N.Y.2d 232, 241 (1998) in support of their argument that this issue should have been resolved by a jury. They assert that although ABCO included several warnings on the machine, those warnings were insufficient to fully apprise White of the risk he was undertaking by reaching into the nip point of the line conveyor. ABCO extensively documents the numerous warnings placed in several locations around the machine, including one just inches from where White actually reached in for the bottle. ABCO argues that under the circumstances of this case, the warnings provided were sufficient under New Jersey law. It also contends that its substantial alteration theory is a complete defense to the failure to warn claim.
 
 
 55
 In a failure to warn strict liability action, the harm complained of results not from a design or structural flaw in the product, but from the failure to provide appropriate warnings about the potential dangers of the product. See Zaza, 144 N.J. at 57-58; Coffman v. Keene Corp., 133 N.J. 581, 593-94 (1993). The New Jersey Products Liability Act provides that
 
 
 56
 In any product liability action the manufacturer or seller shall not be liable for harm caused by a failure to warn if the product contains an adequate warning or instruction . . . . An adequate product warning or instruction is one that a reasonably prudent person in the same or similar circumstances would have provided with respect to the danger and that communicates adequate information on the dangers and safe use of the product, taking into account the characteristics of, and the ordinary knowledge common to, the persons by whom the product is intended to be used . . . .
 
 
 57
 N.J. Stat. Ann. § 2A:58C-4. ABCO is correct that "[t]he prevailing view is that a manufacturer of a component part, not dangerous in and of itself, does not have a duty to warn an employee of the immediate purchaser of the component where the immediate purchaser is aware of the need to attach safety devices." Zaza, 144 N.J. at 60 (citing Restatement (Third) of Torts § 10 cmt. b (Tentative Draft No. 3, 1996)). Yet, as seen by the preceding discussion, ABCO's line conveyor may fail to meet the first part of this defense: a component part that is not dangerous in and of itself. As a result, we conclude that ABCO may have had a duty to warn foreseeable users like White of the dangers of using the conveyors. However, we agree with ABCO that in any event the warnings placed on the conveyor were sufficient to warn White of the dangers he faced. In this case, numerous warnings were placed in several prominent places on the machine. Warnings were also placed under the tail guard that the machine should not be operated absent the guard. Furthermore, and most importantly, there was a graphic depiction of fingers being caught in a roller and this warning was placed in close proximity to where White was injured. We think that ABCO acted as a reasonably prudent manufacturer in warning potential users of the conveyor about the possibility of injury. We cannot conceive of more suitable warnings that should be required under the circumstances. Thus, we affirm the district court's grant of summary judgment insofar as it dismissed the failure to warn claim.
 
 ABCO's Objection to Hamm's Appeal
 
 58
 ABCO argues that Hamm's waived its right to appeal the district court's grant of summary judgment in favor of ABCO by failing to present arguments before the district court in opposition to ABCO's motion. ABCO also contends that, in light of Hamm's status as a settling tortfeasor, Hamm's cross-claim against ABCO for contribution is barred under the laws of New Jersey and New York, and Hamm's claim for indemnification lacks merit. Hamm's replies that it has a right to contribution under New Jersey law from ABCO in the event that ABCO is held strictly liable for a design defect and that the issues raised on appeal were fully litigated below.
 
 
 59
 In light of the somewhat convoluted manner in which this case has proceeded, we conclude that Hamm's did not waive its right to appeal. We note that by the time Hamm's settled White's direct suit against it, the district court had already entered the summary judgment now before us on appeal and that it was not until after the district court's entry of an Order Of Dismissal in October of 1998 that it became clear that the grant of summary judgment in ABCO's favor also included Hamm's cross-claim against ABCO. Since the district court's dismissal of the cross-claim was entered without explanation, we assume that dismissal was predicated on the district court's resolution of ABCO's material alteration defense. In light of our remand on that issue, we also vacate and remand so much of the district court's order as dismissed the cross-claims.
 
 
 60
 Although Hamm's and ABCO present arguments on the merits of Hamm's claims for contribution and indemnification, we decline to prematurely address those arguments. Instead, we are certain that remand will permit valuable clarification of this issue through the presentation of additional evidence and arguments before the district court. In analyzing Hamm's cross-claim against ABCO, the district court should first determine whether Hamm's status as a settling tortfeasor bars recovery for contribution or indemnification. Since state substantive law governs this claim for contribution and indemnification, see Overseas Nat'l Airways, Inc. v. United States, 766 F.2d 97, 100-02 (2d Cir. 1985), the district court will need to apply New York conflict of law principles to determine whether New York or New Jersey law applies. Only if Hamm's status as a settling tortfeasor in the New Jersey action is consistent with its claims for indemnification and contribution should the district court turn to the second question concerning this claim, the proper apportionment of liability under the relevant law.
 
 CONCLUSION
 
 61
 In accordance with the foregoing, we affirm in part and vacate and remand in part for further proceedings consistent with this opinion.
 
 
 
 Notes:
 
 
 [1]
 HSS was unsuccessful at first in obtaining approval for a permanent recycling structure.
 
 
 [2]
 HSS Recycling, Inc. apparently has no existence separate from HSS.
 
 
 [3]
 Hamm's does not challenge the denial of its immunity claim under the New Jersey Workers' Compensation statute.
 
 
 [4]
 ABCO is an Iowa corporation with its principal place of business in that state. Hamm's and HSS have their principal places of business in New Jersey and appear to be New Jersey corporations.