**Maria RODRIGUEZ, Plaintiff,**

v.

**State of CONNECTICUT, et al., Defendants.**

**No. CIV.A.3:99CV2142(JCH).**

United States District Court, D. Connecticut.

Sept. 4, 2001.

Joseph Dimyan, Pinney, Payne, Van Lenten, Burrell, Wolfe & Dillman, Danbury, CT, for plaintiff.

Henri Alexandre, Attorney General's Office, Hartford, CT, Lynn D. Wittenbrink, Attorney General's Office, Hartford, CT, for defendants.

### RULING ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
### [DKT. No. 13]

HALL, District Judge.

The plaintiff, Maria Rodriguez ("Rodriguez"), brings claims on behalf of the estate of her son against the defendants under 42 U.S.C. § § 1983, 1985 and 1988, alleging violations of the Fourth, Fifth, and Fourteenth Amendments and seeking damages for his death. The defendants, John Armstrong, Commissioner of Corrections for the State of Connecticut, Remi Acosta, Jr., former Warden of Garner Correctional Institution, William Kurtzenacker, Gordon Aungst and Bruce Pelletier, Correctional Officers at Garner ("Prison officials")[1] move for summary

---

1. The plaintiff names the State of Connecticut as a defendant on the face of the complaint but the State is not identified in the body of the complaint as a defendant nor are there any allegations against the State laid out in

judgment on the grounds that the plaintiff's claims fail as a matter of law and no genuine issue of material fact exists which would preclude summary judgment. The defendants also move for summary judgment on the basis of lack of personal involvement and qualified immunity.

For the reasons stated below, defendants' motion is GRANTED in part and DENIED in part.

## I. FACTS

The decedent, Juan Rodriguez Jr. ("decedent"), was in the custody of the Connecticut Department of Corrections from 1993 until the time of his death on November 3, 1997. The decedent had been transferred to Garner Correctional Institution ("Garner") in January of 1997. He was designated as a Security Risk Group Safety Threat Member ("SRGSTM") and placed in the Close Custody unit at Garner which is designed to manage gang members. Inmates in the Close Custody unit participate in a three-phase program that becomes less restrictive as the inmate progresses through the program. At the time of his death, the decedent was still in Phase I of the program.

Three months prior to his death, the decedent was assigned to share a cell with Inmate Rushein Davis, who was also designated SRGSTM and in Phase I of the Close Custody program. The decedent was a member of the Latin Kings gang and Davis was a member of the Nation gang. There is dispute between the parties about whether Latin Kings and the Nation are rival gangs. Under the Close Custody Program, prisoners are not allowed to be assigned to share cells with rival gang member until they reach Phase II of the program.

The Prison Officials allege that the decedent and Davis got along well and that they had requested to be assigned to the same cell and that the prison never received any reports by the decedent that he had any concerns regarding his safety or that he had any problems with his cellmate. Rodriguez claims, based on reports from other inmates, that there was a history of problems between the two cellmates and that the prison officials were aware of the problems.

On the night of November 3, 1997, Correctional Officers Pelletier, Aungst and Kurtzenacker were assigned to the decedent's cell block. At 11:30 p.m., Officer Aungst responded to the sound of kicking and yelling coming from the decedent's cell. Davis was standing at the door yelling "Get me the f—— out of here!" and had blood on his face. The decedent was seen lying in the cell and appeared to have been in a fight. He was taken to Danbury Hospital and was pronounced dead later that evening.

There is substantial dispute between the parties regarding what occurred on the cell block earlier that evening. Rodriguez alleges, based on reports of other inmates, that the officers had been watching television all evening in violation of their duties. The other inmates report that there were sounds of an altercation occurring some 20 minutes to a half hour before the officers responded and the inmates believe that the noise from the television masked the sound of the fight. The inmates also claim that the officers delayed in responding to the fight once they heard Davis yelling because they had to remove the television and return it to its inmate owner.

The Prison Officials claim, in contrast, that the officers were not watching television that evening. In addition, they claim

any of the Counts. Therefore, the court does     not view the State as a party to this action.

that Officer Aungst was conducting regular rounds that evening and at 4:00 p.m. and 11:00 p.m. observed the decedent and Davis in their cell getting along well.

▮ Rodriguez filed this complaint, on behalf of her son's estate. In the complaint, Rodriguez alleges that the Prison Officials denied her son his constitutional rights by allowing him to be imprisoned with a dangerous person without any protection and by allowing his death. In addition, the complaint alleges that the Prison Officials acted negligently when operating Garner and that the decedent was killed as a result of this negligence.[2] The defendants file a motion for summary judgment on March 1, 2001.

## II. DISCUSSION

### A. Standard of Review

In a motion for summary judgment, the burden is on the moving party to establish that there are no genuine issues of material fact in dispute and that it is entitled to judgement as a matter of law. *See* Fed. R.Civ.P.56(c); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 256, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *White v. ABCO Engineering Corp.,* 221 F.3d 293, 300 (2d Cir. 2000). The burden of showing that no genuine factual dispute exists rests upon the moving party. *See Carlton v. Mystic Transp., Inc.,* 202 F.3d 129, 133 (2d Cir. 2000) (citing *Gallo v. Prudential Residential Servs., Ltd. Partnership,* 22 F.3d 1219, 1223 (2d Cir.1994)). Once the moving party has met its burden, in order to defeat the motion the nonmoving party must "set forth specific facts showing that there is a genuine issue for trial," *Anderson,* 477 U.S. at 255, 106 S.Ct. 2505, and present

such evidence as would allow a jury to find in his favor. *See Graham v. Long Island R.R.,* 230 F.3d 34, 38 (2d Cir.2000).

In assessing the record, the trial court must resolve all ambiguities and draw all inferences in favor of the party against whom summary judgement is sought. *See Anderson,* 477 U.S. at 255, 106 S.Ct. 2505; *Graham,* 230 F.3d at 38. "This remedy that precludes a trial is properly granted only when no rational finder of fact could find in favor of the non-moving party." *Carlton* 202 F.3d at 134. When reasonable persons, applying the proper legal standards, could differ in their responses to the questions raised on the basis of the evidence presented, the question is best left to the jury. *See Sologub v. City of New York,* 202 F.3d 175, 178 (2d Cir.2000).

### B. Qualified Immunity Standard

▮ The prison officials seek summary judgment on the ground that they have qualified immunity as to claims brought under 42 U.S.C. § 1983. In order to prevail on an action for damages under § 1983 against a government official, the plaintiff must show that the official violated "clearly established statutory or constitutional rights of which a reasonable person would have known." *Conn v. Gabbert,* 526 U.S. 286, 290, 119 S.Ct. 1292, 143 L.Ed.2d 399 (1999) (quoting *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982)). Thus, the inquiry becomes first, whether the plaintiff alleges a violation of a constitutional right, and then second, whether that right was "clearly established" at the time of the alleged violation. *Gabbert,* 526 U.S. at 290, 119 S.Ct. 1292. After this test is met, the qualified immunity defense "protects a

---

**2.** Rodriguez has also included a third count which appears to be based on state law as it references Connecticut General Statute but does not specify which statute she is relying on or pursuant to what state law she brings her claim. The court finds that Rodriguez has not stated a claim upon which relief can be granted and dismisses the Third Count.

government actor if it was 'objectively reasonable' for him to believe that his actions were lawful at the time of his challenged act." *Cerrone v. Brown,* 246 F.3d 194, 199 (2d Cir.2001) (citing *Anderson v. Creighton,* 483 U.S. 635, 641, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987)).

The Supreme Court in recent years has established that the preferred approach to addressing the issue of qualified immunity is first to determine whether the plaintiff has actually alleged the deprivation of a right and, only after the existence of such a right is established, move to the second question of whether the right was "clearly established," and whether the actions of the official were objectively reasonable. *County of Sacramento v. Lewis,* 523 U.S. 833, 841, n. 5, 118 S.Ct. 1708, 140 L.Ed.2d 1043 (1998). Therefore, the court will first assess whether Rodriguez has asserted a viable constitutional claim and will then look to whether the right violated was clearly established and whether the officials acted reasonably.

## C. Constitutional Claims

In their Memorandum in Support of Motion for Summary Judgment ("Defendant's Memo") (Dkt. No. 14), the Prison Officials construed Rodriguez's First Count, alleging violations of the Fourth and Fifth Amendments, as a claim under the Eighth Amendment. In Rodriguez's Memorandum of Law in Support of Plaintiff's Objection to Motion for Summary Judgment ("Plaintiff's Memo") (Dkt. No. 19), Rodriguez addresses the claim under the Eighth Amendment standard and does not object to the claim being construed under the Eighth, rather than the Fourth and Fifth

Amendments. The court, therefore, analyzes the claim in Count One as an Eighth Amendment Claim. In addition, Count Two alleges violations under the same constitutional provisions as Count One and so the court will also construe that count under the Eighth Amendment.[3]

### 1. Personal Involvement

■ It is well settled in this Circuit that the personal involvement of the defendants in an alleged constitutional deprivation is a prerequisite to an award of money damages under § 1983. *Johnson v. Newburgh Enlarged School District,* 239 F.3d 246, 254 (2d Cir.2001) (citing *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995)). Commissioner Armstrong and Warden Acosta argue that they had no personal knowledge of the decedent or Davis, had no involvement with cell assignments, and had no warnings of possible security concerns. Thus, they cannot be held liable.

■ Personal involvement of a supervisory official may be established in a number of ways. Involvement may be established by evidence that "(1) the official participated directly in the alleged constitutional violation; (2) the official, after being informed of the violation through a report or appeal, failed to remedy the wrong; (3) the official created a policy or custom under which unconstitutional practices occurred or allowed the continuance of such a policy or custom; (4) the official was grossly negligent in supervising subordinates who committed the wrongful acts; or (5) the official exhibited deliberate indifference to the rights of others by failing to

---

**3.** Rodriguez includes negligence language in Count Two but does not address the issue of negligence in her memorandum opposing summary judgment. The court interprets this Count to be an Eighth Amendment claim of unsafe conditions because, as in Count I, Rod-

riguez has alleged violations of the Fifth and Fourteenth Amendments. Both parties addressed the allegations in Count Two in their memoranda so the court addresses both Counts in this ruling.

act on information indicating that unconstitutional acts were occurring." *Id.*

In her complaint, Rodriguez seems to be alleging three connected constitutional violations. First, Rodriguez alleges that the Close Custody unit was dangerous to inmates. Second, Rodriguez alleges that the decedent was improperly placed in a cell with Davis, as the two were in rival gangs, and that the decedent had told prison officials that he felt that he was in danger. Third, Rodriguez alleges that the prison officers on duty the evening that the decedent was killed were watching television and, as a result, failed to hear the fight in the decedent's cell and the failure to respond promptly resulted in the decedent's death.

■ Taking the last issue first, Rodriguez has not presented any evidence that Commissioner Armstrong or Warden Acosta were personally involved on the night of the murder in the deprivation of the decedent's constitutional rights. Nor is there any evidence that Acosta and Armstrong received any report that night of the failure of the officers to perform their duties and that they failed to act on such a report. Finally, there is no evidence that Acosta or Armstrong condoned a policy of officers' watching television during their shift at the expense of prisoner safety or that they were grossly negligent in the supervision of the officials or that they had any information regarding the fact that constitutional deprivations were taking place. *See Colon v. Coughlin,* 58 F.3d at 873–74 (finding that the Commissioner of New York's Correctional Services could not be held liable for failing to train and supervise employees when the complaint set forth no facts that would support a claim that the Commissioner

knew or should have known of the events that allegedly caused the constitutional deprivation).

Similarly, there is no evidence presented by Rodriguez that either Acosta or Armstrong were aware of problems between the two inmates and failed to act to separate them. Specifically, the Prison Officials present evidence that there were no grievance reports filed by the decedent with Garner. While there is factual dispute over whether the decedent complained to anyone, Rodriguez presents no evidence which would allow a fact finder to infer that Acosta or Armstrong were ever told about any alleged complaints.

However, Rodriguez has presented the testimony of two inmates that members of the Nation and the Latin King gangs should not have been placed in the same cell because they are members of rival gangs and that this placement resulted in her son's death. As a inmate in phase I of the Close Custody program, the decedent should not, according to policy, been placed in a cell with a rival gang member. The Prison Officials assert throughout their papers that the Nation and the Latin Kings are compatible gangs. The court finds that there is a material issue of fact whether members of the gangs are rivals and, therefore, members should not be placed together in the same cells. Acosta and Armstrong were not directly responsible for cell assignments, *see* Acosta Aff. At ¶ 10 ("generally, cell partner assignments and cell partner changes were left to the Unit Manager, who at the time was Captain Edwin Myers"). However, because Garner ran a gang unit that allegedly had the practice of placing rival gang members of the Nation and the Latin Kings in the same cell,[4] Acosta and Armstrong are per-

---

4. The court infers from the assertion that the Nation and the Latin Kings "were considered

to be compatible with one another," *see e.g.,* Acosta Aff. at ¶ 12, that the prison officials

sonally involved in the alleged constitutional violation in so far as they "allowed the continuance of such a policy or custom." *Colon v. Coughlin*, 58 F.3d at 873–74.[5]

Therefore, the court finds that Commissioner Armstrong and Warden Acosta can be held liable for Rodriguez's claims under 42 U.S.C. § 1983 as they had personal involvement in the constitutional deprivation.

▆▆▆ The Prison Officials argue that the three officers on duty had no participation in the cell assignment of the decedent and were not aware of any problems between the two. Rodriguez has presented no evidence that the three officers on duty had any involvement in placing the decedent in a cell with a dangerous cellmate or that they had any participation in the supervision of Garner or any control over the operation of the Close Custody unit. In addition, while Rodriguez has presented testimony from an inmate that the decedent told Captain Myer, the Unit Manager, that he was having problems with Davis, *see* Plaintiff's Memo, Exh. A, there is no evidence that Myer told other officers of the alleged problems nor is Myer named as a defendant in this case. Therefore, the three officers cannot be held liable for claims based on cell placement because they had no personal involvement in the actions alleged.

▆▆▆ However, Rodriguez has also presented an allegation that the officers failed to hear the fight in the decedent's cell because they were watching television in violation of their duties. While the Prison Officials deny that the officers were watching television, there is genuine dispute over this material fact in the record. Rodriguez's claim that they were watching television and were unable to respond promptly to the decedent implicates the three officers personally in the death. In addition, Rodriguez presents the testimony of an inmate that, at 11:30 p.m. on the night of the murder, an inmate in the decedent's cell told a corrections officer that he needed to get away from his cellmate, but that the officer told him to tell the unit manager in the morning. *See* Plaintiff's Memo, Exh. A. Thus, there is some evidence in the record that the officers knew that Davis and the decedent were having problems that evening, but failed to do anything. Therefore, the defendants' motion for summary judgment on the grounds that Officers Pelletier, Augnst and Kurtznacker were not personally involved in the decedent's death is denied.

### 2. Eighth Amendment Claims

Having determined that Armstrong, Acosta and the three officers on duty the night of the murder were personally involved in the alleged constitutional deprivation in so far as the former two have been accused of improperly allowing a policy of placing the decedent with a rival gang member, and the latter three of neglecting their duties and failing to prevent the death of the decedent, the court must

allowed placement of members of the two gangs in the same cell even during Phase I because the prison believed that these gangs were not rivals.

5. Rodriguez has also alleged that the entire Close Custody Unit is dangerous to inmates. The court construes those claims as against Acosta and Armstrong, but finds that Rodriguez has presented no evidence that the Close Custody Unit was dangerous to inmates, other than in placing rival gang members, as alleged by the plaintiff, together in Phase I. The defendants have presented evidence that the Unit has, in fact, been successful at reducing violence. The court, therefore, does not consider the issue of personal involvement and grants summary judgment to the defendants on that claim.

now address whether the actions of the Prison Officials rise to the level of a violation of the Eighth Amendment.

The Eighth Amendment places a duty on prison officials to provide humane conditions of confinement for inmates, including "taking reasonable measures to guarantee the safety of the inmates ..." including protecting prisoners from violence by other prisoners. *Farmer v. Brennan*, 511 U.S. 825, 832, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994) (citations omitted). In order to make out a viable claim for a violation of the Eighth Amendment, an inmate must show that (1) the deprivation was sufficiently serious; and (2) that the prison official had a "sufficiently culpable state of mind." *Id.* (quoting *Wilson v. Seiter*, 501 U.S. 294, 302–303, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991)). The state of mind has been defined as one of "deliberate indifference" to the safety of an inmate. *Wilson*, 501 U.S. at 302–303, 111 S.Ct. 2321. Deliberate indifference has, in turn, been defined by the subjective standard that "the official must be both aware of the facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer*, 511 U.S. at 837, 114 S.Ct. 1970.

In order to establish an Eighth Amendment claim against the Prison Officials, Rodriguez must first show that the decedent was incarcerated under conditions posing a substantial risk of serious harm. The decedent was in a restrictive gang management program and was in an early phase of the program which meant that he could not live with a rival gang member. Drawing all inferences in favor of Rodriguez, the non-moving party, if the decedent was placed in a cell with a rival gang member who was also classified as a Security Risk Group Safety Threat Member, then objectively, the decedent was incarcerated in high risk conditions.

Rodriguez has asserted that Acosta and Armstrong were responsible for a prison program which placed members of rival gangs together in the same cells at substantial risk of harm to the inmates. It is unclear from the record, however, whether Acosta and Armstrong had the requisite knowledge that the program they were responsible for overseeing had a policy of placing members of the Nation and the Latin Kings in the same cells during Phase I of the Close Custody program despite the fact that these were rival gangs. In other words, Rodriguez must establish that the senior prison officials in this case knew that these were rival gangs or had the knowledge from which to draw that inference but did nothing to change the placement policy. While the court recognizes that the issue of a prison official's knowledge may be an issue of fact for the factfinder, *Farmer*, 511 U.S. at 842, 114 S.Ct. 1970, Rodriguez has presented no evidence that Acosta or Armstrong knew that the Nation and the Latin Kings were rival gangs nor has she presented any evidence that they had facts from which to infer the rivalry. Acosta states in his affidavit that the two gangs were compatible and Rodriguez has not refuted that this was his knowledge and reasonable belief regarding the two gangs. Therefore, the court finds that Rodriguez has not presented any evidence that Warden Acosta or Commissioner Armstrong possessed the requisite knowledge regarding these two gangs to satisfy the Eighth Amendment standard and, thus, has not made out a viable Eighth Amendment claim against these two defendants.

Rodriguez must also establish that the three officers on duty the night of the murder had the subjective knowledge that the decedent faced a substantial risk of harm. The officers did not have any personal knowledge of the decedent or his cellmate nor did they know of any prob-

lems the two had previously. Arguably, however, officers on a Close Custody unit with gang members designated as security risks, knew that inmates faced a substantial risk of harm if there were no officers at their posts or patrolling the cell blocks. Watching television allegedly prevented the officers from hearing any fights that broke out and neglect of their posts left inmates unsupervised. *See* Plaintiff's Memo, Exh. B. A factfinder could infer that experienced corrections officers knew that this placed inmates at risk, particularly when there are allegations that someone in the decedent's cell complained to an officer about his cellmate.

■■■ Even if, however, the officer's behavior that evening when watching television were to rise only to the level of negligence, Rodriguez has presented inmate testimony that the guards, once aware of the fight, put the television away before calling for medical help. *Id.* Prison officials may be found free from liability if they respond reasonably to a risk, even if the harm is not averted. *Farmer,* 511 U.S. at 844, 114 S.Ct. 1970. However, to delay calling for medical attention when an inmate is hurt in order to avoid, presumably, risking discipline for watching television on duty, is not a reasonable response to risk. At that point, the officers knew that the decedent faced a serious risk of harm. The court recognizes that there is substantial dispute whether the officers were even watching television. However, at summary judgment the inquiry is whether the plaintiff has asserted a viable legal claim based on an alleged set of facts that are in dispute. Given the facts put forward by Rodriguez, the court finds that she has made out a viable Eighth Amendment claim against the three officers.

### D. Qualified Immunity Analysis

■■■ Having presented a viable Eighth Amendment claim against the three officers named as defendants, the court must address the remaining prongs of the qualified immunity test. First, the court must determine whether the constitutional right alleged to have been violated was clearly established at the time of the violation. *Conn v. Gabbert,* 526 U.S. 286, 290, 119 S.Ct. 1292, 143 L.Ed.2d 399 (1999). The Supreme Court, in its 1994 decision *Farmer v. Brennan, supra,* clearly established that the Eighth Amendment imposes a duty on prison officials to provide humane conditions and to take measures to insure the safety of inmates. The Court, in the *Farmer* decision, also clearly outlined the standard to be employed by courts when determining whether a violation of the Eighth Amendment has occurred and, in doing so, established guidelines for prison officials regarding when liability will be imposed for such violations. *See also, Hayes v. New York City Dep't of Corrections,* 84 F.3d 614 (2d. Cir.1996). Therefore, the court finds that Eighth Amendment right alleged to have been violated in this case was clearly established at the time of the violation.

The court, therefore, moves to the final inquiry of whether it was objectively reasonable for the officers on duty to believe that their conduct was lawful. *Menon v. Frinton,* 2001 WL 359499 *2 (D.Conn. 2001) (citing *Lennon v. Miller,* 66 F.3d 416, 421 (2d Cir.1995)). There is a material issue of fact regarding whether the officers on duty were watching television. Assuming that the officers were watching television, the court cannot conclude, as a matter of law, that it was objectively reasonable for the officers on duty the evening of the decedent's murder to believe that watching television on duty for extended periods of time or that delaying calling medical help for the decedent so that they could remove the television was

lawful given their duty to take reasonable measures to insure the health and safety of prisoners. Therefore, the court finds that summary judgment is not appropriate on qualified immunity grounds and that the question of whether the officers acted reasonably is an issue for trial, to be decided on the basis of the jury's findings regarding the factual issues in dispute. *Oliveira v. Mayer*, 23 F.3d 642 (2d Cir.1994).

## III. CONCLUSION

Defendants' motion for summary judgment is GRANTED in part and DENIED in part. The court grants the motion as to defendants Armstrong and Acosta, finding that the plaintiff has not established any material issue of dispute fact concerning a viable Eighth Amendment claim against these two defendants. The court denies the motion as to defendants Pelletier, Aungst and Kurtzenacker, finding that the plaintiff has asserted a viable claim against these defendants and finding that they are not immune from liability on the basis of qualified immunity.

**SO ORDERED.**