**BHC INTERIM FUNDING, L.P.; Travelers Investment Corporation, Plaintiffs,**

v.

**FINANTRA CAPITAL, INC., et al., Defendants.**

**No. 02CIV.6553 (WK)(DFE).**

United States District Court, S.D. New York.

Sept. 24, 2003.

See, also, 2003 WL 21467544.

Joshua L. Mallin, Weg and Myers, P.C., New York City, for Plaintiffs.

Audrey Strauss, Fried, Frank, Harris, Shriver & Jacobson, New York City, for PricewaterhouseCoopers, LLP.

Stephen G. Rinehart, Jenkens & Gilchrist Parker Chapin LLP, New York City, for Charles Litt, Thomas Dwyer, and Arthur Press.

Barry J. Friedberg, Trachtenberg Rodes & Friedberg LLP, New York City, for Anthony Brada.

## OPINION

GRIESA, District Judge.

Defendants PricewaterhouseCoopers, LLP ("PwC") and Anthony Brada have filed motions under Fed.R.Civ.P. 12(b)(6) to dismiss the complaint as to these defendants. Defendants Charles Litt, Thomas Dwyer and Arthur J. Press have filed a joint motion to dismiss under Fed.R.Civ.P. 9(b) and 12(b)(6). Plaintiffs filed responses to the three motions, along with a cross-motion for leave to file an amended complaint.

The action was formerly on the docket of Judge Whitman Knapp of this court.

Judge Knapp referred all the above motions to Magistrate Judge Douglas F. Eaton. Magistrate Judge Eaton granted plaintiffs' cross-motion for leave to file an amended complaint, and ruled that the amended complaint would be treated as the operative pleading in considering the pending motions to dismiss. He gave the moving defendants time to amend their reply papers, but they chose not to do so.

The claims in the amended complaint against defendants Litt, Dwyer and Arthur Press consist of both federal law claims and state law claims. All the claims against defendants PwC and Brada are under state law. Obviously this is a situation which presents jurisdictional problems, as will be discussed later.

On April 9, 2003 Magistrate Judge Eaton rendered his Report and Recommendation. He recommended that Judge Knapp (1) dismiss the federal claims as to Litt, Dwyer and Arthur Press with prejudice, and dismiss the state-law claims as to these defendants without prejudice; (2) dismiss all claims against PwC with prejudice, and (3) dismiss plaintiff BHC's claims against Brada with prejudice, and dismiss plaintiff Travelers' claims against Brada without prejudice.

Plaintiffs have filed objections to the Magistrate Judge's report, and the moving defendants have filed responses to the objections.

On April 16 the case was reassigned to the undersigned, Judge Thomas P. Griesa.

In my review of the Magistrate Judge's Report and Recommendation, it is necessary to start with the subject of jurisdiction. As indicated above, the amended complaint contains both federal and state law claims. As to defendants Litt, Dwyer and Arthur Press, the recommendation is that the federal claims be dismissed with prejudice, and that the state-law claims be dismissed without prejudice pursuant to 28 U.S.C. § 1367(c)(3). Thus the recommendation is to decline supplemental jurisdiction over the state-law claims against these three defendants. These defendants do not object to this treatment of jurisdiction, and I concur with it.

As to PwC, against which only state-law claims are pleaded, the Magistrate Judge asserted supplementary jurisdiction under 28 U.S.C. § 1367. Both plaintiffs and PwC agree to such jurisdiction. I concur.

As to Brada, also involved in state law claims only, the Magistrate Judge drew a fine line. He asserted supplementary jurisdiction over the claims against Brada made by one of the plaintiffs, BHC, and recommended that these claims should be dismissed with prejudice. However, he recommended that jurisdiction be declined as to the claims against Brada made by the other plaintiff, Travelers, and recommended that the latter claims be dismissed without prejudice pursuant to 28 U.S.C. § 1367(c)(3). Brada has no objection to this treatment of jurisdiction, and I concur.

I now turn to Magistrate Judge Eaton's recommendations on the merits, relating to the dismissal of counts in the amended complaint for failure to state legally cognizable claims. He dismissed these with prejudice. The Report and Recommendation of Magistrate Judge Eaton contains a remarkably painstaking and perceptive analysis of the relevant portions of the amended complaint, and a thorough statement of the legal authorities. The Magistrate Judge demonstrates conclusively why the various claims should be dismissed. Also, since an amended complaint was already filed following receipt of the motions (an unusual procedure, but actually helpful in disposing of the case), it is clear that no further amendment should be allowed, as the Magistrate Judge has held. For these reasons I concur in the findings and con-

clusions of the Report and adopt the Recommendations.

The parties should settle appropriate judgments.

SO ORDERED.

### REPORT AND RECOMMENDATION TO JUDGE KNAPP

EATON, United States Magistrate Judge.

Plaintiffs BHC Interim Funding, L.P. ("BHC") and Travelers Investment Corporation ("Travelers") assert two federal claims and twelve state-law claims arising from BHC's failed loan to a subsidiary of defendant Finantra Capital, Inc. ("Finantra").

Defendants PricewaterhouseCoopers, LLP ("PwC") and Anthony Brada ("Brada") each filed a separate motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(6). Defendants Charles Litt, Thomas Dwyer, and Arthur J. Press (collectively "the Moving Directors") filed a joint motion to dismiss pursuant to Fed.R.Civ.P. 9(b) and 12(b)(6). On December 9, 2002, plaintiffs filed separate responses to the three motions, along with a cross-motion for leave to file an Amended Complaint. All of the movants filed reply papers on January 17, 2003. On February 6, 2003, Judge Knapp referred this case to me for general pretrial supervision and to write a Report and Recommendation on the three motions to dismiss. By Memorandum and Order dated February 11, I granted plaintiffs' cross-motion for leave to file an Amended Complaint, and I wrote that I would treat the Amended Complaint as the operative pleading in considering the pending motions to dismiss. (I gave the moving defendants until February 21 to add to their

reply papers, but they chose not to.) I have decided to deny the requests for oral argument.

For the reasons stated below, I recommend that Judge Knapp (1) dismiss the federal claims as to Litt, Dwyer, and Arthur Press with prejudice, and dismiss the state-law claims as to Litt, Dwyer, and Arthur Press without prejudice; (2) dismiss all the claims against PwC with prejudice, and (3) dismiss BHC's claims against Brada with prejudice, and dismiss Travelers' claim against Brada without prejudice.

### FACTUAL BACKGROUND

This case concerns a loan of $3.65 million made by BHC to fund part of Finantra's $20 million acquisition of Travelers. Finantra was a Florida-based finance company. (Am.Compl.¶¶ 1, 21.) In 1999, Finantra created a wholly-owned subsidiary, Travelers Acquisition Corporation ("TAQ")[1], as a vehicle to acquire Travelers. On or about October 29, 1999, BHC loaned $3.65 million to TAQ, to be repaid on October 24, 2000. The terms of the Loan Agreement stated that Finantra agreed to (a) guarantee repayment of the loan, (b) deliver to BHC warrants to purchase common stock of both Travelers and Finantra, and (c) pledge all of the common stock of TAQ and TAQ's subsidiaries. (Am. Compl. Exh. A at 12–13, Section 3.1.) Finantra also agreed to refrain from upstreaming or outstreaming Travelers' assets and from entering into any transactions with any officer, director, or employee of Travelers. In addition, Finantra agreed to hire "a large, reputable accounting firm to conduct independent audits" of

---

1. I will use this abbreviation "TAQ" because it is used in the Amended Complaint. Other documents have used the abbreviation "TAC."

Finantra and its subsidiaries. (Am. Compl.¶ 61.)

In December 1999, Finantra retained PwC. (Am.Compl.Exh. L.) PwC issued only one report on any Finantra financial statements—a clean report for the year ending December 31, 1999. During 2000, Finantra issued quarterly financial data in its Form 10–Q filings with the Securities and Exchange Commission ("SEC"); these filings disclosed on their face that they were unaudited.[2] It appears to be undisputed that PwC reviewed this data, but never audited it or issued an opinion about it.

In October 2000, TAQ defaulted on the loan and Finantra defaulted on the guarantee. By agreement dated November 16, 2000, BHC extended the maturation date of the Loan Agreement to March 31, 2001. (Am. Compl. Exh. C, the "Extension Agreement".)

In December 2000, Finantra retained PwC to perform an audit for 2000. (Am. Compl.Exh. M.) PwC began the work but suspended its audit in March 2001. (*See* 12/9/02 Cross–Motion by Pls., last exh., Exh. 2 at Tr. 358–60.) On April 4, 2001, TAQ again defaulted on the loan and Finantra again defaulted on the guarantee. BHC then foreclosed on the stock of Travelers, in which it had taken a security interest at the time of the October 1999 loan. (*See* Compendium filed with our

Court on 10/18/02 by PwC, Tab O (5/11/01 8–K filing by Finantra).)

On August 16, 2002, BHC and Travelers filed their first Complaint.[3] I shall now briefly outline the claims of the lead plaintiff BHC, as expanded in the Amended Complaint.

a. The claims against Finantra and its officers and directors (including the three Moving Directors).

BHC alleges that it was induced to enter into the 1999 Loan Agreement through false and misleading statements and information provided by Finantra and its officers and directors. (Am.Compl.¶¶ 65–66.) The Amended Complaint refers generally to conduct by the "Finantra Officers and Directors," a term which is defined in the Amended Complaint to include Litt, Dwyer and Arthur Press among several other individuals. (*Id.* at ¶ 34.) Litt was a Director and the President of Finantra. (*Id.* at ¶ 26.) Dwyer and Arthur Press were outside Directors. It is alleged that Dwyer and Arthur Press were members of Finantra's Audit Committee "at all times material and relevant hereto," but in reality it seems clear that they were only named to the Audit Committee on February 3, 2000. (*Id.* at ¶¶ 28, 31, 75, Exh. I at 4.)

Furthermore, BHC alleges that, after the October 2000 default, it would not have extended the maturation date of the Loan Agreement had it been aware of deceptive

---

**2.** A number of Finantra's SEC filings are contained in Tab I through Tab O of a Compendium filed with our Court on 10/18/02 by PwC. It appears to be undisputed that these filings are self-authenticating and that the Court may take judicial notice of them when deciding a motion to dismiss. (*See* PwC's 10/18/02 Memo. at 2 n. 1 and n. 2, and at 4 n. 3.)

**3.** On July 25, 2001, a shareholder of Finantra, Herbert Black, filed a separate securities fraud action against Finantra and several individuals (including the three Moving Di-

rectors in our case). *Black v. Finantra Capital Inc.*, No. 01 Civ. 6819. On November 27, 2001, Judge Jed S. Rakoff dismissed all claims against all defendants except Finantra and its Chief Executive Officer Robert Press (the son of outside director Arthur Press). On November 1, 2002, the jury found that Finantra and Robert Press were liable to Black for securities fraud. Those two defendants made a post-verdict motion, which is currently pending before Judge Rakoff.

transactions and misrepresentations that Finantra and its officers and directors had made in violation of the 1999 Loan Agreement. (*Id.* at ¶ 67.) BHC alleges that Finantra's officers and directors (1) used Travelers' clients' funds to pay off Finantra's debts; (2) transferred cash and assets from Travelers to pay off Finantra's debts; and (3) enabled themselves (or at least Maynard J. Hellman) to use Travelers' funds for personal expenses. (*Id.* at ¶¶ 65, 69, 108.)

b. The claims against the officers and directors of Travelers (including Anthony Brada).

After the closing of the Loan Agreement, Travelers became a subsidiary of Finantra. The Travelers officers and directors are alleged to have participated in the improper transfers of Travelers' funds. (*Id.* at ¶¶ 55–56.) However, as with the Finantra officers and directors, the Amended Complaint refers generally to conduct by the "Travelers Officers and Directors" without specifying any conduct on the part of the individuals making up this group. Anthony Brada was a vice-president of Travelers. (*Id.* at ¶ 32.) His brief says that he "was the only Travelers employee to stay on after the acquisition." (Brada's 10/17/02 Mem. at 2.) The Amended Complaint does not otherwise mention him by name, except to allege that Brada was "privy to certain illicit transactions" involving Finantra and that he "engaged in numerous communications with BHC regarding BHC's concerns over TRAVELERS['] financial condition." (*Id.* at ¶ 53.) None of these communications is described except for an e-mail that he forwarded, without comment, a few days before the second and final default. (Am.Compl.Exh. F.)

c. The claims against Pricewaterhouse-Coopers, LLP ("PwC").

The Amended Complaint alleges that PwC was engaged by Finantra to provide auditing and accounting services to Finantra from December 1999 through the date of Finantra's second default in April 2001. (*Id.* at ¶ 84.) December 1999 was, of course, more than one month after BHC made the loan. It appears to be undisputed that PwC issued only one opinion—a clean report for the year 1999, dated March 30, 2000. (Compendium filed in our Court on 10/18/02 by PwC, Tab K at p. F–2.) The Amended Complaint does not annex that report. It does annex Exhibit Q, which it characterizes as "the August 9, 2000 Report to the Audit Committee." (Am.Compl.¶¶ 121–23.) But Exhibit Q does not give any opinion and it talks in a very preliminary way about the quarter ended June 30, 2000:

> At the request of management, we began our quarterly review procedures on August 9. Accordingly, as of the date of mailing this report, we have just begun our quarterly review procedures.

(Am. Compl., Exh. Q at 2.)

In October 2000, as I mentioned earlier, TAQ defaulted on the loan and Finantra defaulted on the guarantee. By agreement dated November 16, 2000, BHC extended the maturation date of the Loan Agreement to March 31, 2001. BHC alleges, in vague and general terms, that the following occurred in March 2001:

> 124. [PwC] was notified in or about March 2001 by an employee of TRAVELERS that potential fraud was occurring at TRAVELERS and failed to inform BHC or TRAVELERS of said allegations.

> 125. [PwC] knew of the existence of the BHC Loan Agreement an[d] BHC's status as an intended third party beneficiary and engaged in communications with BHC regarding certain FINANTRA transactions, including numerous written correspondence from BHC to

[PwC] in or about March 2001, and numerous telephone conversations.

In very general fashion, BHC alleges that PwC violated Generally Accepted Accounting Principles ("GAAP") and Generally Accepted Auditing Standards ("GAAS") by:

a. Failing to investigate and report FINANTRA's false reporting and FINANTRA's dealings in violation of the BHC Loan Agreement;

b. Failing to obtain a sufficient understanding of FINANTRA's internal controls so as to properly perform the audit and determine the nature and extent of the Company's lack of internal controls;

c. Failing to obtain sufficient, competent, evidential matter to afford a reasonable basis for an opinion on the financial statements under audit;

d. Failing to identify and report the circumstances in which GAAP has not been consistently observed; and

e. Failing to investigate, identify and report transactions and transfers, especially the transfer of TRAVELERS funds and assets to FINANTRA and HELLM[A]N's trust accounts, that violated the BHC Loan Agreement and Extension Agreement.

(Am. Compl. at ¶ 189, *see also* ¶¶ 80–95.)

## DISCUSSION

A motion to dismiss for failure to state a claim can be granted "only if it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Tarshis v. Riese Organization*, 211 F.3d 30, 35 (2d Cir.2000) (internal quotation marks omitted); *see Nelson v. Nielsen Media Research Inc.*, 207 F.Supp.2d 300, 302 (S.D.N.Y.2002) (Marrero, J.). While "bald assertions and conclusions of law" are insufficient to defeat a motion to dismiss, our Court must accept as true all factual allegations in the Amended Complaint, draw all inferences from those allegations in favor of the plaintiffs, and construe the Amended Complaint liberally. *Tarshis*, 211 F.3d at 35.

The claims against PwC and against Brada are made solely under non-federal common law. Jurisdiction based on diversity of citizenship is not alleged.[4] The Amended Complaint seems content with only one jurisdictional allegation:

17. The jurisdiction of this Court is based on Section 27 of the Exchange Act, 15 U.S.C. § 78(a) et[ ] seq. and 28 U.S.C. Section 1331.

This assertion has not been challenged by PwC or Brada. I assume that plaintiffs intend to justify the joinder of PwC and Brada (as well as the inclusion of state-law claims against the Moving Directors) on a basis which plaintiffs have not articulated, namely supplemental jurisdiction under 28 U.S.C. § 1367. In the words of that statute, the plaintiffs may contend that their state-law claims "are so related to" the federal claims "that they form part of the same case or controversy under Article III of the United States Constitution."

The only federal claims are Counts VII and VIII, brought under Sections 10(b) and 20 of the Securities Exchange Act of 1934 by BHC against Finantra and the Finantra Officers and Directors. Of those defendants, several have apparently not

---

4. As to the two plaintiffs, BHC appears to be a citizen of Delaware and Connecticut, and Travelers appears to be a citizen of California. (Am.Compl.¶¶ 19–20.) Defendant Brada appears to be a California citizen. (*Id.* at ¶ 32.) Defendant PwC is alleged to be a limited liability partnership, and some of its partners are probably citizens of Delaware, Connecticut, and California. If Judge Knapp dismisses PwC and Brada, as I recommend, then the remaining defendants might be subject to diversity jurisdiction.

yet been served, but Litt, Dwyer, and Arthur Press have been served (and are now the three "Moving Directors").

I shall discuss the three motions in the following order: (I) the Moving Directors' motion; (II) PwC's motion; and (III) Brada's motion.

## I. THE MOVING DIRECTORS' MOTION TO DISMISS

The Amended Complaint alleges federal and state claims against the "Finantra Officers and Directors," a term which is defined to include (among others) Charles Litt, Thomas Dwyer, and Arthur J. Press. Those three men (the Moving Directors) have moved to dismiss Counts VII and VIII, the only federal claims in the Amended Complaint, for failure to state a claim and for failure to comply with Fed. R.Civ.P. 9(b) and with the Private Securities Litigation Reform Act of 1995 ("PSLRA"). They also argue that our Court should then decline to exercise supplemental jurisdiction over the state-law claims.

For the reasons stated below, I recommend that Counts VII and VIII be dismissed as to the three Moving Directors, with prejudice. I recommend that the state-law claims against the three Moving Directors be dismissed without prejudice.

### A. Section 10(b) Claim against the Moving Directors

Count VII is brought by BHC against Finantra and the "Finantra Officers and Directors." It alleges that they violated Section 10(b) of the Securities Exchange Act of 1934 by making material misrepresentations and omissions that artificially inflated the value of Finantra's stock and induced BHC to enter into, and extend, the Loan Agreement.

In order to state a claim under Section 10(b), plaintiffs must prove that a defendant:

(1) made misstatements or omissions of material fact; (2) with scienter; (3) in connection with the purchase or sale of securities; (4) upon which plaintiffs relied; and (5) that plaintiffs' reliance was the proximate cause of their injury.

*In re I.B.M. Corp. Sec. Litig.*, 163 F.3d 102, 106 (2d Cir.1998); *Silva Run Worldwide Ltd. v. Bear Stearns & Co., Inc.*, 2000 WL 1672324, at *4 (S.D.N.Y. Nov.6, 2000) (Knapp, J.).

Securities fraud claims are subject to the heightened pleading requirements of the PSLRA and Rule 9(b). *See, e.g., Novak v. Kasaks*, 216 F.3d 300, 305–06 (2d Cir.2000). The PSLRA provides, in relevant part:

(1) Misleading statements and omissions

In any private action arising under this chapter in which the plaintiff alleges that the defendant—

(A) made an untrue statement of a material fact; or

(B) omitted to state a material fact necessary in order to make the statements made, in the light of the circumstances in which they were made, not misleading;

the complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed.

(2) Required state of mind

In any private action arising under this chapter in which the plaintiff may recover money damages only on proof that the defendant acted with a particular state of mind, the complaint shall, with

respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.

15 U.S.C. § 78u–4(b). This is complemented by Rule 9(b), which requires that "a complaint making such allegations must (1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Shields v. Citytrust Bancorp, Inc.,* 25 F.3d 1124, 1127–28 (2d Cir.1994) (internal quotations marks omitted), *quoted in Novak,* 216 F.3d at 306. Thus, "under the heightened pleading requirements of Rule 9(b) and the PSLRA, plaintiffs must allege the first two elements of a securities fraud claim—fraudulent acts and scienter—with particularity." *Elliott Associates, L.P. v. Hayes,* 141 F.Supp.2d 344, 353 (S.D.N.Y. 2000) (Scheindlin, J.), *aff'd,* 26 Fed.Appx. 83 (2d Cir.2002).

The Moving Directors argue that BHC's Section 10(b) claim must be dismissed because BHC has (1) not shown that any misstatements were made in connection with the purchase or sale of a security, (2) not pleaded the alleged misstatements with particularity, (3) not outlined the role that each individual defendant had in the alleged violation, (4) not adequately pleaded scienter, and (5) not properly alleged causation.

### 1. *Connection with the Purchase or Sale of a Security*

■ The Loan Agreement between BHC and Finantra provided that BHC would receive warrants to purchase common stock of both Travelers and Finantra. (Am. Compl., Exh. A at 13.) Such a warrant is included in the definition of "security" in 15 U.S.C. § 78(c)(a)(10). In addition, Finantra pledged to BHC all of the capital stock of TAQ owned by Finantra, and TAQ pledged to BHC all of the capital stock of its subsidiaries (which included Travelers). (Am. Compl., Exh. A at 12.) The pledge of stock as a guarantee for a loan is equivalent to the sale of the stock for the purposes of the federal securities laws. *Rubin v. United States,* 449 U.S. 424, 430–31, 101 S.Ct. 698, 701–02, 66 L.Ed.2d 633 (1981); *Marine Bank v. Weaver,* 455 U.S. 551, 554, 102 S.Ct. 1220, 1222 n. 2, 71 L.Ed.2d 409 (1982); *Chemical Bank v. Arthur Andersen & Co.,* 726 F.2d 930, 939–40 (2d Cir.1984).

BHC has adequately pleaded that the alleged fraud occurred "in connection" with the delivery of the warrants and with the pledges of the stock. The Amended Complaint alleges that the 10–Q Report filed by Finantra prior to the Loan Agreement was materially false and misleading. BHC also alleges that, were it not for the misleading statements contained in Finantra's financial statements and public filings, BHC would not have entered into the Loan Agreement. (Am.Compl.¶¶ 8, 67, 153.)

BHC also alleges that, after the loan transaction closed, there were additional misrepresentations, which misled BHC into excusing the October 2000 default and signing the Extension Agreement. But these alleged misrepresentations, made after the October 1999 closing, were not made "in connection with" the purchase or sale of any security.

### 2. *Failure to Identify Misstatements with Particularity*

■ Under Rule 9(b) and the PSLRA, a securities fraud plaintiff is required to specify each statement that is alleged to have been misleading, along with the reasons why it is misleading. *See Shields,* 25 F.3d at 1127–28, *quoted in Novak,* 216

F.3d at 306 The Moving Directors say that BHC has failed to satisfy this requirement. I agree.

The Amended Complaint relies on broad generalities when discussing the allegedly misleading statements. It uses meaningless terms such as "various public and/or private statements and communications." (Am.Compl.¶ 43.)

At Paragraph 168, the Amended Complaint makes a stab at identifying a particular document. It singles out "FINANTRA's pre-Loan Agreement 10–Q filing, filed most immediately prior to entering into the Loan Agreement with BHC." BHC has failed to identify the date of this 10–Q filing, or to attach it to the Amended Complaint. However, a search of the SEC's website reveals that Finantra filed a 10–QSB on August 16, 1999, and that this was Finantra's last 10–Q filing prior to its entering into the Loan Agreement. I assume that this is the document referred to in the Amended Complaint.

Paragraph 169 alleges: "The statements in said filing were materially false and misleading, in that the financial information overstated revenues and assets, and understated losses and debts." Reading Paragraphs 168 and 169 together with Paragraph 65, I gather that BHC is claiming that the August 16, 1999 10–QSB did not contain information about (1) a short term note in the amount of $500,000 owed by Finantra; (2) an outstanding judgment against Finantra in the amount of $150,000; and (3) the fact that Finantra's Chief Executive Officer (Robert Press)

was allegedly still affiliated with a corporation that was being investigated by the Federal Trade Commission and the Federal Bureau of Investigation. (*See* Am. Compl. ¶¶ 65.[5])

The $500,000 note, which is attached to the Amended Complaint as Exhibit H, was payable to C & M Capital. However, the note is dated September 30, 1999. Thus, it did not exist when the 10–QSB was filed on August 16, 1999.

The reference to "an outstanding judgment against Finantra in the amount of $150,000" is far too vague. The Amended Complaint does not allege the date of the judgment, or any other detail which would satisfy the requirements of Rule 9(b) and the PSLRA.

Finally, Paragraph 65 has a non-financial allegation:

65. FINANTRA issued a series of false, misleading and incomplete statements ..., or failed to issue any such statements, including but not limited to, the following:

. . . . .

d. failed to reveal, and in fact affirmatively denied, [Robert] PRESS's continued affiliation with Performance Capital Management, a corporation under investigation by, *inter alia*, the Federal Trade Commission and Federal Bureau of Investigation ....

The Amended Complaint does not identify the date of this statement, or where it was made. The August 1999 Form 10–QSB

---

**5.** The Amended Complaint alleges other misleading omissions, but these obviously relate to conduct after the closing and hence they were not made "in connection with" the purchase or sale of a security. For example, Finantra allegedly pledged certain stock to the Gross Foundation after Finantra had already pledged that stock to BHC at the closing. (Am.Compl.¶ 65(c).) Other post-closing

misconduct is also alleged: (a) the use of Travelers' clients' funds to pay off Finantra's debts; (b) the transfer of cash and assets from Travelers to pay off Finantra's debts and to create an artificially inflated value for Finantra stock; and (c) the diversion of Travelers' funds to Finantra and its officers and directors. (Am.Compl.¶¶ 65(e), 69.)

did not discuss Robert Press's background or affiliations. Such information was contained in the annual report dated April 4, 1999 (the Form 10–KSB); the entry for Robert D. Press included the following:

... In addition, from 1989 to 1997, Mr. [Robert D.] Press served as President of Performance Capital Management, Inc., a holding company controlled by Messrs. Press and Steven L. Edelson, the former Chairman of the Board of the Company, which had interests in brokerage and investment management, ...

(Compendium filed with our Court on 10/18/02 by PwC, Tab J at 14; a similar statement appeared in the next annual report, dated March 30, 2000, *id.* at Tab K at 3.)

In Paragraph 65(d), BHC seems to allege that, in 1998 and 1999, Robert Press had some sort of "continued affiliation with Performance Capital Management." But the Amended Complaint gives no particulars about the continued affiliation, or about what statement "affirmatively denied" such affiliation. Moreover, the Amended Complaint does not allege that Robert Press himself was the subject of investigation.

BHC has failed to identify, with the particularity required by Rule 9(b) and the PSLRA, any relevant pre-closing misstatement made by anyone. Accordingly, I recommend that Count VII of the Amended Complaint be dismissed as to the Moving Directors. Nonetheless, I will address the Moving Directors' additional grounds for dismissal of Count VII.

### 3. *Group Pleading*

The Moving Directors argue that the Amended Complaint, by continually referring to the conduct of the "Finantra Officers and Directors," fails to properly set forth the role that each individual defen-

dant allegedly had in the securities law violations, and thus does not give proper notice to each defendant of the nature of the claims brought against him. Indeed, with the exception of the introductory paragraphs identifying each party, the Amended Complaint mentions Litt in only two of its 199 paragraphs, Dwyer in just four, and Arthur Press in only three. By contrast, the term "Finantra Officers and Directors" is used many times throughout the Amended Complaint. This type of pleading would normally run afoul of the requirements of Rule 9(b).

However, the group pleading doctrine "permits a plaintiff to allege that misstatements contained in company documents may be presumed to be the work of the company's officers and directors." *In re Livent, Inc. Sec. Litig.*, 78 F.Supp.2d 194, 219 (S.D.N.Y.1999) (Sweet, J.); *see DiVittorio v. Equidyne Extractive Ind., Inc.*, 822 F.2d 1242, 1247 (2d Cir.1987). To the extent it is alleging misstatements contained in "company documents," BHC is entitled to rely on the group pleading doctrine.

### 4. *Scienter*

■ The Moving Directors also argue that the Amended Complaint fails to adequately plead scienter. Under the PSLRA, a plaintiff must "state with particularity facts giving rise to a strong inference that the defendant acted with [scienter]." 15 U.S.C. § 78u–4(b)(2). The "strong inference" may arise through (a) a showing that the defendant had both motive and opportunity to commit fraud, or (b) a showing of strong circumstantial evidence of conscious misbehavior or recklessness. *Kalnit v. Eichler*, 264 F.3d 131, 138 (2d Cir.2001); *Silva Run Worldwide Ltd. v. Bear Stearns & Co., Inc.*, 2000 WL 1672324, at *3 (S.D.N.Y. Nov.6, 2000) (Knapp, J.).

The first theory is motive and opportunity to commit fraud. The Moving Directors were officers and directors of Finantra and, thus, they had the opportunity to commit fraud. (Am.Compl.¶¶ 39–40.) However, I find that BHC has failed to allege with particularity that Litt, Dwyer or Arthur Press had a motive to commit fraud. The Second Circuit has stated:

Motives that are generally possessed by most corporate directors and officers do not suffice; instead, plaintiffs must assert a concrete and personal benefit to the individual defendants resulting from the fraud.

*Kalnit,* 264 F.3d at 139. And Judge Scheindlin has written:

Plaintiffs contend that the Halls' motive for making the alleged misrepresentations in the Offering Memorandum was to obtain funds which they intended to spend on personal expenses. If plaintiffs had averred that defendants made personal use of a *substantial* portion of United Golf's funds *shortly* after soliciting plaintiffs' investment, then their pleadings might have been adequate. The facts alleged in the Complaint, however, are not nearly so compelling.

The Complaint avers that of the nearly $1,725,000 which was invested in the company ($1 million by plaintiffs), defendants spent *less than $125,000* on personal expenses, and they did so approximately *one year* after defendants invested in United Golf. These allegations of misconduct are simply too far removed from plaintiffs' solicitation of investments through the Offering Memorandum to create the requisite inference of scienter. A contrary result would eviscerate the protections afforded by Rule 9(b), as any shareholder could *parlay a claim for misuse of corporate assets* into one for securities fraud. Accordingly, plaintiffs' pleadings

do not satisfy the standard for alleging "motive and opportunity" under Rule 9(b).

*High View Fund, L.P. v. Hall,* 27 F.Supp.2d 420, 427–28 (S.D.N.Y.1998) (italics in the original, but the underlining is mine) (footnote omitted).

The Amended Complaint, at Paragraph 105, alleges: "FINANTRA breached ... by transferring ... cash and assets of TRAVELERS to ... certain FINANTRA Officers and Directors." The last five words are misleading. When we get to Paragraph 108, we learn that TAQ and/or Travelers were charged for "the personal expenses of certain FINANTRA Officers and Directors, namely HELLMAN." Paragraphs 70, 106, and 107 allege that Finantra caused TAQ and Travelers to purchase *and* quickly write off the receivables of three companies controlled by Hellman, Robert Press and Barry J. Goldstein. But there is no particularized allegation about any motive held by any of the three Moving Directors (Litt, Dwyer, and Arthur Press).

■ I turn to the second theory, which requires "strong circumstantial evidence of conscious misbehavior or recklessness." *Kalnit,* 264 F.3d at 138. Such a strong inference may arise where the complaint sufficiently alleges that the defendant (1) engaged in deliberately illegal behavior; or (2) knew facts or had access to information suggesting that his public statements were not accurate; or (3) failed to check information that he had a duty to monitor. *Novak v. Kasaks,* 216 F.3d 300, 311 (2d Cir.2000).

The Amended Complaint has failed to set forth "strong circumstantial evidence of conscious misbehavior or recklessness" on the part of Dwyer or Arthur Press. They were outside directors. It seems clear that they were not named to the Audit Committee until February 3, 2000.

(Am. Compl. ¶ 75, Exh. I at 4.) Prior to that date, the Audit Committee was "comprised of Messrs. Hellman and Dupuy." (Compendium filed in our Court on 10/18/02 by PwC, Tab J (annual report dated 4/4/99) at 15.)

Litt joined Finantra on May 15, 1999, as its President and as an inside director. (*Ibid.*) He signed the $500,000 promissory note on September 30, 1999. (Am.Compl., Exh. H.) That is strong circumstantial evidence that he knew the facts about the note. But, as I said earlier, the Amended Complaint has not alleged with particularity that Litt made any misleading statement on or before the closing (which occurred on or about October 29, 1999).

### 5. *Causation*

■ Finally, the Moving Directors argue that BHC's Section 10(b) claim contains no adequate allegation of causation. Under the federal securities laws, causation involves two separate elements, transaction causation and loss causation. *See Suez Equity Investors, L.P. v. Toronto-Dominion Bank*, 250 F.3d 87, 95 (2d Cir. 2001). Transaction causation requires the plaintiff to allege that, but for the misleading statement or omission, the plaintiff would not have entered into the transaction at issue. *Id.* Loss causation has been likened to the question of "proximate cause, meaning that in order for the plaintiff to recover it must prove that the damages it suffered were a foreseeable consequence of the misrepresentation." *Id.* at 96. The Second Circuit has stated that plaintiffs can adequately allege transaction causation and loss causation in the following way:

by averring both that they would not have entered the transaction but for the misrepresentations and that the defendants' misrepresentations induced a disparity between the transaction price and the true 'investment quality' of the securities at the time of transaction.

*Id.* at 97–98 (emphasis in the original).

■ As to transaction causation, BHC alleges that it relied on Finantra's financial statements and public filings and that, but for misstatements and omissions contained in those documents, it would not have entered into the Loan Agreement.[6] (Am. Compl.¶¶ 67, 145, 153.) This satisfies the pleading requirement for transaction causation.

■ As to loss causation, BHC has essentially alleged what passed muster in *Suez Equity*, 250 F.3d at 97–98, that "the defendants' misrepresentations induced a disparity between the transaction price and the true 'investment quality' of the securities." The Amended Complaint states that Finantra's public filings were misleading and that the misstatements and omissions contained in them artificially inflated Finantra stock prices. (Am. Compl.¶¶ 149, 152, 153.) Read with the remainder of the Amended Complaint, these allegations indicate that, as a result of the misstatements, the price of Finantra's stock was artificially inflated, and that BHC was induced to enter into the Loan Agreement due to an inaccurate view of the value of the warrants to purchase the common stock of Finantra. This allegation of loss causation is sufficient to defeat a motion to dismiss. *See Burstyn v. Worldwide Xceed Group, Inc.*, 2002 WL 31191741, at *6 (S.D.N.Y. Sep.30, 2002)

---

**6.** In their reply brief at page 8, the Moving Directors argue that BHC, by focusing on the Extension Agreement in its opposition papers, has abandoned any claim of reliance and causation with respect to the original Loan Agreement. However, the Amended Complaint, not BHC's opposition brief, is the relevant pleading. The Amended Complaint alleges that BHC relied by entering into the Loan Agreement.

(Lynch, J., citing *Suez Equity*, 250 F.3d at 98).

To summarize, I find that the Amended Complaint has failed to identify, with the particularity required by Rule 9(b) and the PSLRA, (a) any relevant pre-closing misstatement by anyone, and (b) any facts giving rise to a strong inference that Dwyer or Arthur Press acted with scienter.

I recommend that Judge Knapp dismiss Count VII with prejudice as to the Moving Directors. The Moving Directors' brief (dated October 18, 2002), at pages 5–11, explained in detail why the original complaint was deficient under Rule 9(b) and the PSLRA. More than 50 days later, the plaintiffs prepared their Amended Complaint. I see no good reason why they should be allowed to prepare a Second Amended Complaint.

**B.** *Section 20(a) Claim against the Moving Directors*

As an alternative to Count VII, BHC brings Count VIII, which alleges that the "Finantra Officers and Directors" are liable under Section 20(a) of the Exchange Act as controlling persons of Finantra. This would become pertinent to any one of the three Moving Directors if the jury were to find that he did not commit the primary violation alleged in Count VII, but that another defendant did. Section 20(a) provides that:

> Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

15 U.S.C. § 78t(a). In order to establish "control person liability" under Section 20(a), a plaintiff must show (1) a primary violation of Section 10(b) by a controlled person; (2) control of the primary violator by the defendant; and (3) some "culpable participation by the defendant in the perpetration of the fraud." *Suez Equity*, 250 F.3d at 101.

The Moving Directors argue that BHC has failed to plead any of these three elements. I find it necessary to consider only the first element, a primary violation by a controlled person. As discussed above, BHC has failed to plead a primary violation of Section 10(b); it has twice failed to identify, with the required particularity, any relevant pre-closing misstatement by anyone. Accordingly, I recommend that the Section 20(a) claim against the Moving Directors be dismissed, with prejudice. *See Rich v. Maidstone Financial, Inc.*, 2001 WL 286757, at *8–9 (S.D.N.Y. March 23, 2001) (Batts, J.).

**C.** *State Law Claims against the Moving Directors*

At this early stage, the Moving Directors do not attack the state-law claims except to say that our Court should decline to retain jurisdiction over the Moving Directors if we dismiss the federal claims against them. I recommend that Judge Knapp dismiss all the state-law claims against the Moving Directors, without prejudice, pursuant to 28 U.S.C. § 1367(c)(3).

**II.** *PWC'S MOTION TO DISMISS*

The Amended Complaint contains five claims against PwC; all of them are based on non-federal common law. Counts II and IV are brought by BHC for professional negligence and breach of a fiduciary

duty. Counts XI, XII, and XIII are brought by Travelers for negligence, professional negligence, and breach of a fiduciary duty. For the reasons stated below, I recommend that all claims against PwC be dismissed with prejudice.

PwC's moving brief carefully spelled out reasons why the controlling law might be either the law of New York (where PwC is headquartered) or the law of Florida (where it performed most of the auditing work). It also discussed the substantive law of New York and of Florida. Plaintiffs' opposing brief then urged that our Court should apply New York law. (12/9/02 Mem. Opposing PwC at 10 n. 9.) In view of the plaintiffs' preference, and in view of the fact that PwC is based in New York, I will analyze the claims against PwC under New York law. *See Hannex Corp. v. GMI, Inc.*, 140 F.3d 194, 203 n. 7 (2d Cir.1998); *VTech Holdings Ltd. v. Lucent Technologies Inc.*, 172 F.Supp.2d 435, 437 (S.D.N.Y.2001) (Koeltl, J.).

### A. *BHC's Claims against PwC*

#### 1. *Professional Negligence (Count II)*

■ Under New York law, accountants owe a duty of care only to (a) those with whom they have contracted, and (b) those with whom they have a "relationship so close as to approach that of privity." *Parrott v. Coopers & Lybrand*, 95 N.Y.2d 479, 483, 718 N.Y.S.2d 709, 711, 741 N.E.2d 506 (2000); *see Ultramares Corp. v. Touche*, 255 N.Y. 170, 182–83, 174 N.E. 441 (1931).

■ As to the first category, PwC contracted with Finantra, not with BHC. The Amended Complaint, at Paragraph 94, asserts that BHC was the intended third party beneficiary of the contracts between PwC and Finantra. This is flatly contradicted by the contracts, which are annexed to the Amended Complaint and say, in pertinent part:

> Our audit is intended for the benefit of [Finantra]. The audit will not be planned or conducted in contemplation of reliance by any third party or with respect to any specific transaction. Therefore, items of a possible interest to a third party will not be specifically addressed and matters may exist that would be assessed differently by a third party, possibly in connection with a specific transaction.

(Am. Compl. Exh. L at 2, Exh. M at 3.) Nowhere do PwC's two letters of engagement mention BHC, or lenders in general, or the Loan Agreement. Accordingly, we must reject BHC's assertion that it was a third-party beneficiary. *See LaSalle National Bank v. Ernst & Young LLP*, 285 A.D.2d 101, 109, 729 N.Y.S.2d 671, 676–77 (1st Dep't 2001).

■ I turn to the alternative theory that BHC and PwC had a "relationship so close as to approach that of privity." Here, BHC must satisfy a three-part test:

> (1) the accountants must have been aware that the financial reports were to be used for a particular purpose or purposes; (2) in the furtherance of which a known party or parties was intended to rely; and (3) there must have been some conduct on the part of the accountants linking them to that party or parties, which evinces the accountants' understanding of that party or parties' reliance.

*Credit Alliance Corp. v. Arthur Andersen & Co.*, 65 N.Y.2d 536, 551, 493 N.Y.S.2d 435, 443, 483 N.E.2d 110 (1985).

The Amended Complaint was prepared 50 days after PwC's moving brief explained the *Credit Alliance* test. BHC now alleges that PwC "engaged in communications with BHC regarding certain FINANTRA transactions, including numerous written correspondence from BHC to [PwC] in or about March 2001, and numer-

ous telephone conversations." (*Id.* at ¶ 125.) BHC argues that these communications, combined with PwC's awareness of the specific provisions of the Loan Agreement, created a relationship between BHC and PwC so close as to approach that of privity. I disagree.

Under the first two prongs of the *Credit Alliance* test, it is not enough to allege that an accountant was aware that its report could be made available to a client's lender upon request. Instead, the plaintiff must "show that [the accountant] was well aware that a primary, if not the exclusive, *end and aim* of auditing its client" was to provide information to the plaintiff. *Credit Alliance,* 65 N.Y.2d at 554, 493 N.Y.S.2d 435, 483 N.E.2d 110 (emphasis in the original). In other words, it is insufficient to allege that the accountant's client "sought to induce plaintiffs to extend credit, [where] no claim is made that [the accountant] was being employed to prepare the reports with that particular purpose in mind." *Id.* at 553, 493 N.Y.S.2d 435, 483 N.E.2d 110.

In *Security Pacific Business Credit, Inc. v. Peat Marwick Main & Co.,* 79 N.Y.2d 695, 586 N.Y.S.2d 87, 597 N.E.2d 1080 (1992), the Court of Appeals dealt with a negligence claim brought against an accountant (Main Hurdman) by Security Pacific (one of the lenders to the accountant's client). There was evidence that Main Hurdman was aware that its client and Security Pacific were in negotiations for a line of credit, but there was no showing that Main Hurdman was aware that it "was retained to prepare the audit report for the purpose of inducing [Security Pacific] to extend credit to [its client]." 79 N.Y.2d at 706, 586 N.Y.S.2d 87, 597 N.E.2d 1080. Accordingly, there could be no liability. *Id.* at 707, 586 N.Y.S.2d 87, 597 N.E.2d 1080.

Of course, PwC had no connection with Finantra or Travelers until after BHC had already made the loan. The essence of the claims against PwC is as follows:

> [PwC] violated GAAP and GAAS principles by failing to investigate, identify and report transactions and transfers, especially the transfer of TRAVELERS funds and assets to FINANTRA, that violated the BHC Loan Agreement and Extension Agreement.

(Am.Compl.¶ 120.) But the Amended Complaint does not allege that PwC undertook any duty to BHC to monitor for violations of the Loan Agreement or the Extension Agreement. And there is no allegation that PwC was aware that the financial reports were to be used for a particular purpose of monitoring for such violations.

In *Housing Works, Inc. v. Turner,* 179 F.Supp.2d 177, 217 (S.D.N.Y.2001), Judge Marrero granted a motion to dismiss where plaintiff failed to allege that the accountant was "aware that the financial reports were to be used for a particular purpose"—in that case, the purpose of terminating plaintiff as a city contractor.

BHC has failed to allege any facts showing that PwC was aware that a primary end and aim of its engagement was to provide information to BHC. Hence, BHC has not satisfied the first two prongs of the *Credit Alliance* test.

█ The third prong of the test requires conduct on the part of the accountant linking it to the plaintiff and evincing the accountant's understanding of the plaintiff's reliance. *Credit Alliance,* 65 N.Y.2d at 551, 493 N.Y.S.2d 435, 483 N.E.2d 110. Thus, the plaintiff must "plead some affirmative conduct by [the accountant] linking it to [plaintiff's] alleged reliance, other than the performance of the audit itself." *LaSalle,* 285 A.D.2d at 107, 729 N.Y.S.2d 671. In the case at bar,

PwC's affirmative conduct would have to be clear enough to overcome the strong language written by PwC in both of its engagement letters, in December 1999 and December 2000. As noted earlier, they each state: "The audit will not be planned or conducted in contemplation of reliance by any third party...." (Am. Compl. Exh. L at 2, Exh. M at 3.)

BHC relies on its allegation that PwC "engaged in communications with BHC regarding certain FINANTRA transactions, including numerous written correspondence from BHC to [PwC] in or about March 2001, and numerous telephone conversations." (Am.Compl.¶ 125.) It is revealing that BHC does not allege that it had any significant communication with PwC from December 1999 through February 2001. March 2001 was long after the initial default in October 2000. It was less than a month before the extended maturation date of March 31, 2001. The alleged last-minute communications are not "conduct on the part of the accountants ... which evinces the accountants' understanding of [BHC's] reliance." *Credit Alliance*, 65 N.Y.2d at 551, 493 N.Y.S.2d 435, 483 N.E.2d 110. Moreover, the same type of allegations were found to be insufficient in *Housing Works*, where Judge Marrero noted that "[c]ourts have uniformly required more than phone calls, general communications or unacknowledged assertions of reliance in order to establish linking conduct." 179 F.Supp.2d at 219 (internal quotation marks omitted). Judge Marrero dismissed under Rule 12(c), and wrote:

> [Plaintiff] must come forward with more than its own unilateral perceptions of its reliance or conclusory statements about

the significance of meetings between the parties; it must allege, at a minimum, conduct on the part of [the accountant] evincing its awareness of [plaintiff's] contemplated use of the report and reliance.

*Housing Works*, 179 F.Supp.2d at 219. *See LaSalle*, 285 A.D.2d at 107, 729 N.Y.S.2d 671 (phone call and correspondence between lender plaintiffs and accountant was "unilateral conduct by the lenders, and not affirmative conduct by" the accountant).

BHC's relationship with PwC did not satisfy the *Credit Alliance* test. Accordingly, I recommend that Judge Knapp dismiss BHC's negligence claim against PwC with prejudice.

### 2. Breach of Fiduciary Duty (Count IV)

██ BHC also brings a claim against PwC for a breach of a fiduciary duty. Fiduciary liability "is predicated on a stricter standard of care" than negligence. *Klein v. Churchill Coal Corp.*, 1988 WL 92114, at *15 (S.D.N.Y. May 5, 1988) (Knapp, J.). As outlined above, BHC has failed to state a negligence claim against PwC because it failed to allege facts showing that it had a sufficiently close relationship with PwC. A fortiori, BHC has failed to state a claim for breach of fiduciary duty. *Ibid.* New York's Appellate Division has stated that there is "no support for the conclusion that a fiduciary relationship exists between plaintiffs and defendants in the absence of a contractual relationship between them." *Alpert v. Shea Gould Climenko & Casey*, 160 A.D.2d 67, 73, 559 N.Y.S.2d 312, 315 (1st Dep't 1990).[7]

---

**7.** BHC's 12/9/02 brief, at pages 11–12, cites some non-accountant cases, including *de Kwiatkowski v. Bear, Stearns & Co., Inc.*, 126 F.Supp.2d 672 (S.D.N.Y.2000), without mentioning that the Second Circuit had reversed at 306 F.3d 1293 (2d Cir. Sept.19, 2002). In any event, that case involved a written contract between the plaintiff and the defendant.

Count IV's allegations are similar to those in *Greenblatt v. Richard Potasky Jewelers,* 1994 WL 9754 (S.D.N.Y. Jan.13, 1994) (McKenna, J.). In *Greenblatt,* the plaintiff had consigned jewelry to a company which went bankrupt while in possession of the jewelry. The plaintiff argued that the company's accountant had breached a fiduciary duty to warn him about the company's deteriorating financial condition. Judge McKenna rejected this argument, writing:

> [The accountant] had no duty to inform Plaintiff of [the company's] financial condition. "Courts do not generally regard the accountant-client relationship as a fiduciary one." Moreover, a purely commercial transaction does not impose fiduciary duties upon the parties to that transaction. It follows, therefore, that when the allegedly aggrieved party is at best a third party to an accountant-client relationship, and no commercial transaction is executed between two parties—indeed, when no relationship whatsoever exists between two parties—no fiduciary duties may be imposed on either party.

1994 WL 9754, at *4 (citations omitted).

Accordingly, BHC's claim against PwC for breach of fiduciary duty should be dismissed with prejudice.

### B. *Travelers' Claims against PwC*

The other plaintiff in this lawsuit is Travelers. BHC, as noted earlier, foreclosed on the stock of Travelers. Travelers now asserts its own claims against PwC.

#### 1. *Negligence and Professional Negligence (Counts XI and XII)*

In its opposition to PwC's motion to dismiss, Travelers argues that it actually did have a contractual relationship with PwC and, thus, PwC owed it a duty of care. For support, Travelers relies on a misstatement of PwC's retention agreement with Finantra. The Amended Complaint at Paragraph 85 alleges:

> The December 18, 2000 Letter of Agreement specifically contemplates work for other legal entity audits (e.g., TRAVELERS ACCEPTANCE CORPORATION) or any other requested attest reports (e.g., Compliance reports for securitizations from TRAVELERS ACCEPTANCE CORPORATION).

This is false. The retention agreement is annexed to the Amended Complaint as Exhibit M; it says, in pertinent part:

> Our audit is intended for the benefit of [Finantra]. The audit will not be planned or conducted in contemplation of reliance by any third party or with respect to any specific transaction. Therefore, items of a possible interest to a third party will not be specifically addressed and matters may exist that would be assessed differently by a third party, possibly in connection with a specific transaction.
>
> \* \* \* \* \* \*
>
> This engagement letter and fee estimate is for the consolidated financial statements of [Finantra]. Separate engagement letters and fee estimates will be provided to you prior to commencement of work for any other legal entity audits (e.g., Travelers Acceptance Corporation) or any other requested attest reports (e.g., compliance reports for securitizations from Travelers Acceptance Corporation).

(Am. Compl. Exh. M at 3, 5–6.) There is no allegation that any such "[s]eparate engagement letters" were ever provided, let alone accepted. Nevertheless, Paragraph 86 of the Amended Complaint asserts that "[s]aid audit of TRAVELERS's [sic] was completed ...." No other information is

given about this "audit." Necessarily, Paragraph 86 must be read to allege that PwC inspected the records of Travelers (and of its subsidiaries such as Travelers Acceptance Corporation) as part of PwC's auditing of Finantra. If so, then PwC had a duty to conduct its inspection of Travelers' records with due care. However, PwC's duty was to the party with whom it had contracted, not Travelers. In *Housing Works*, 179 F.Supp.2d at 215 n. 38, Judge Marrero rejected the idea that an accountant owes a duty to a company merely because the company is the subject of an audit by the accountant, where the accountant was retained by a third party.

Accordingly, Travelers had no contractual relationship with PwC. We next consider whether Travelers alleges facts that satisfy the three-prong *Credit Alliance* test. However, the allegations are wholly insufficient. As to the first prong, Travelers has failed to "show that [the accountant] was well aware that a primary, if not the exclusive, *end and aim* of auditing its client [Finantra]" was to provide information to Travelers. *See Credit Alliance*, 65 N.Y.2d at 554, 493 N.Y.S.2d 435, 483 N.E.2d 110 (emphasis in the original). As to the second and third prongs, there is no clear allegation of how Travelers relied on PwC, let alone that PwC knew that Travelers would be relying.

Since PwC owed no duty to Travelers, I recommend that Travelers' negligence claim against PwC be dismissed with prejudice.

### 2. Breach of Fiduciary Duty (Count XIII)

■ A fortiori, Travelers' allegations are insufficient to impose "fiduciary liability, which is predicated on a stricter standard of care." *Klein*, 1988 WL 92114, at *15. Accordingly, Travelers' claim against

PwC for breach of fiduciary duty should be dismissed with prejudice.

To summarize, I recommend that Judge Knapp dismiss all the claims against PwC, with prejudice, on the ground that PwC owed no duty to either BHC or Travelers. I find it unnecessary to address PwC's additional grounds for dismissal.

### III. *BRADA'S MOTION TO DISMISS*

Anthony Brada was a Vice President of Travelers. (Am.Compl.¶ 32.) The Amended Complaint brings three claims against the "Travelers Officers and Directors," a term which it defines to include Brada. All three claims against Brada are based on state law. BHC brings a claim for breach of a fiduciary duty (Count IV) and a claim for negligent misrepresentation (Count VI). Travelers brings a claim for breach of a fiduciary duty (Count XIII). Brada moves to dismiss all three claims. Plaintiffs' opposing brief is a strange document that sometimes refers to Brada as the "President" of Travelers, and spends many pages under the delusion that a securities fraud claim has been made against Brada. For the reasons stated below, I recommend that Judge Knapp dismiss BHC's claims against Brada with prejudice, and dismiss Travelers' claim against Brada without prejudice.

### A. *BHC's Claims against Brada*

#### 1. *BHC's Claim for Breach of Fiduciary Duty (Count IV)*

##### a. *Choice of Law*

The parties have not addressed the question of which state's law should be applied to the claims made against Brada. However, as I said earlier, plaintiffs argued for the application of New York law to their claims against PwC.

In our Circuit, we must apply the choice of law rules of the forum state when hearing claims that are based upon state law, unless this would conflict with a federal policy or interest. *See In re Gaston & Snow,* 243 F.3d 599, 601–07 (2d Cir.2001); *Cromer Finance Ltd. v. Berger,* 2002 WL 826847, at *4 n. 5 (S.D.N.Y. May 2, 2002) (Cote, J.). The parties have not identified any such conflict and I cannot discern one. Therefore, I will apply New York's choice of law rules.

Under New York's choice of law principles, a claim involving breach of a fiduciary duty owed by a corporate officer is governed by the law of his company's state of incorporation. *See Benjamin v. Kim,* 1999 WL 24706, at *13 n. 13 (S.D.N.Y. April 28, 1999) (McKenna, J.); *High View Fund, L.P. v. Hall,* 27 F.Supp.2d 420, 428 n. 6 (S.D.N.Y.1998) (Scheindlin, J.). Given that Travelers is alleged to be a California corporation and Brada is similarly alleged to be a resident of California, it appears that California law should be applied to the fiduciary duty claims against Brada. As set forth below, California law appears to be the same as New York law on the topic of whether a fiduciary duty existed.

### b. *Whether Brada Owed a Fiduciary Duty to BHC*

While not specifically couched in these terms, Brada's argument is that he had no relationship with BHC from which a fiduciary duty would arise. The Amended Complaint indicates that BHC's connections to Travelers (and therefore to Brada) consisted of (1) BHC's status as a secured lender responsible for some of the financing used by Finantra and TAQ to acquire Travelers, and (2) BHC's possession of warrants to purchase common stock of Travelers. As will be seen, neither of

these two connections created a fiduciary relationship between BHC and Travelers.

Under either California or New York law, the relationship between a lender and borrower is not fiduciary in nature. *See, e.g., Republic National Bank v. Hales,* 75 F.Supp.2d 300, 316–17 (S.D.N.Y.1999) (Sweet, J.) (relationship between creditor and debtor is not a fiduciary one); *Village on Canon v. Bankers Trust Company,* 920 F.Supp. 520, 532 (S.D.N.Y.1996) (Koeltl, J.) (no fiduciary relationship arises from even a long-standing debtor-creditor relationship); *Borel Bank & Trust Co. v. Aubain,* 1995 WL 743724, at *2 (N.D.Cal. Nov.30, 1995) ("a fiduciary relationship does not typically arise between a lender and borrower"); *Okura & Co. (America), Inc. v. Careau Group,* 783 F.Supp. 482, 494 (C.D.Cal.1991) (same). In the instant case, the borrower was TAQ, and BHC held a security interest in all of the common stock of TAQ and Travelers. BHC entered into an arms length commercial transaction. Nothing in BHC's status as lender created a fiduciary duty between BHC and Travelers.

BHC seems to rely greatly on the fact that it held warrants to purchase common stock of Finantra and Travelers. *See* Am. Compl. ¶ 133. Brada was an officer of Travelers. It is true that a corporation's officers owe a fiduciary duty to the corporation's shareholders, but the Amended Complaint does not allege that BHC was a shareholder of Travelers. Instead, pursuant to the terms of the Loan Agreement, BHC simply held warrants to purchase Travelers stock. The Amended Complaint does not allege that BHC exercised these warrants. Essentially, BHC was an option holder. Under either California or New York law, an option holder, unlike a shareholder, is not owed a fiduciary duty by a corporation's officers. *See, e.g., Bell v. Leakas,* 1993 WL 77320, at *6 (S.D.N.Y.

March 13, 1993) (McKenna, J.) ("corporate officers owe no fiduciary duty to stock optionees"); *O'Connor & Associates v. Dean Witter Reynolds, Inc.*, 529 F.Supp. 1179, 1185 (S.D.N.Y.1981) (Lasker, J.) (option holder, unlike shareholder, is owed no fiduciary duties by corporate insiders); *Pittelman v. Pearce*, 6 Cal.App.4th 1436, 8 Cal.Rptr.2d 359, 362–63 (1992) (debt holder who holds stock options is not owed any fiduciary duty under California law), *cited in Traverso v. Clear Channel Comm., Inc.*, 52 Fed.Appx. 878, 880 (9th Cir.2002). Since BHC is a Delaware partnership, I would also mention that Delaware law is the same. *See Benjamin*, 1999 WL 249706, at *13 (convertible debenture holder is owed no fiduciary duty under Delaware law); *Powers v. British Vita, P.L.C.*, 969 F.Supp. 4, 5–6 (S.D.N.Y.1997) (Pollack, J.) (no fiduciary duties are owed to option holders under Delaware law).

Thus, BHC was not owed any fiduciary duty by Travelers or by the officers of Travelers. As a result, BHC's breach of fiduciary duty claim against Brada should be dismissed with prejudice.

2. *BHC's Claim for Negligent Misrepresentation (Count VI)*

a. *Choice of Law*

■ When we come to the claim of negligent misrepresentation, New York and California law diverge. Under New York law, the existence of a fiduciary duty is a prerequisite to recovery for negligent misrepresentation. *See Stewart ·v. Jackson & Nash*, 976 F.2d 86, 90 (2d Cir.1992); *Madera v. Metropolitan Life Ins. Co.*, 2002 WL 1453827, at *8 (S.D.N.Y. July 3, 2002) (Mukasey, J.); *Atkins Nutritionals, Inc. v. Ernst & Young, LLP*, 301 A.D.2d 547, 754 N.Y.S.2d 320, 322 (2d Dep't 2003). Therefore, if New York law were applied to this claim, the dismissal of the fiduciary duty claim would mandate dismissal of the neg-

ligent misrepresentation claim as well. *See Republic National Bank*, 75 F.Supp.2d at 317 n. 15.

However, under California law, negligent misrepresentation is treated as a form of actual fraud which may occur in any type of relationship. *See Byrum v. Brand*, 219 Cal.App.3d 926, 268 Cal.Rptr. 609, 617 (1990). It is not necessary for the plaintiff to show that a fiduciary relationship existed between the parties. *Maltz v. Union Carbide Chemicals & Plastics Co., Inc.*, 992 F.Supp. 286, 308 (S.D.N.Y.1998) (Wood, J.) (applying California law).

In light of this conflict, the Court must apply New York choice of law rules to determine which state's law should govern. New York choice of law rules dictate that "the law of the jurisdiction with the most significant interest in, or relationship to, the dispute" should be applied. *White v. ABCO Engineering Corp.*, 221 F.3d 293, 301 (2d Cir.2000). Generally, the significance of each state's interest is determined by focusing on the parties' domiciles and the locus of the tort. *Id.* If, as in the instant case, the law involved is conduct-regulating, then "the locus of the tort will almost always be determinative." *Krock v. Lipsay*, 97 F.3d 640, 646 (2d Cir.1996); *see White*, 221 F.3d at 301. In fraudulent representation cases, the "locus of the tort" is the place where the injury occurred, not the place where the fraud originated. *Kingdom 5–KR–41, Ltd. v. Star Cruises PLC*, 2002 WL 432390, at *12 (S.D.N.Y. March 20, 2002) (Schwartz, J.).

BHC is the party claiming to be injured. The question is: in which state did its alleged injury occur? BHC does not allege that it had any connection with California beyond its relationship with Travelers and Brada. Thus, it seems that the alleged injury to BHC did not occur in

California, even if the misrepresentations originated in California.

BHC alleges that it is a Delaware partnership with a principal place of business in Connecticut. (Am.Compl.¶ 19.) But it appears that BHC's New York office was the one that dealt with Travelers. (*See* Am. Compl. Exh. D.) Moreover, the BHC–Finantra Loan Agreement said that it would be governed by the internal laws of the State of New York without regard to conflicts of laws principles. (Am. Compl. Exh. A at ¶ 8.14.) Finally, BHC has urged our Court to apply New York law to its claims against PwC. (12/9/02 Memo. Opposing PwC at 10 n. 9.) Weighing all these factors, I conclude that New York has the most significant interest in BHC's negligent misrepresentation claim against Brada. Therefore, I will apply New York law to that claim.

### b. *Merits*

 As stated above, under New York law, "a plaintiff may recover for negligent misrepresentation only where the defendant owes her a fiduciary duty." *Stewart*, 976 F.2d at 90. Thus, the absence of a fiduciary relationship between BHC and Brada mandates the dismissal of this claim.

Furthermore, even if we were to assume the existence of a fiduciary duty, the Amended Complaint would still fail to state a claim for negligent misrepresentation. In order to state a claim for negligent misrepresentation, a plaintiff must allege that the defendant (1) negligently (2) made a direct representation to the plaintiff (3) upon which the plaintiff was expected to rely and (4) upon which the

plaintiff reasonably relied (5) with a resulting injury. *See In re JWP Inc. Sec. Litig.*, 928 F.Supp. 1239, 1253 (S.D.N.Y.1996) (Conner, J.) (New York law[8]). And, in federal court, such a claim must be pleaded with the particularity required by Fed. R.Civ.P. 9(b). *See Madera*, 2002 WL 1453827, at *8.

BHC fails to identify any specific representations or statements made to it by Brada, or by the Travelers Officers and Directors as a group. At Paragraph 53, the Amended Complaint alleges:

> Defendant BRADA was equally privy to certain illicit transactions involving FINANTRA and TRAVELERS and engaged in numerous communications with BHC regarding BHC's concerns over TRAVELERS['] financial condition. A copy of an e-mail message originating from Brada regarding the response to BHC concerning these transactions dated March 26, 2001 is attached hereto as Exhibit "F."

Exhibit F is an e-mail from B [Robert] Press to M Hellman with a cc to T Brada. BHC does not identify any misrepresentations in this e-mail. In any event, it seems clear that the entire text of the e-mail was written by Robert Press. It appears that Brada forwarded this e-mail, without comment, to Conni Page (who is unidentified but presumably was an employee of BHC).

The date, content, or nature of any other communications by Brada is not alleged. At Paragraph 149, the Amended Complaint alleges that "FINANTRA Officers and Directors, and TRAVELERS Officers and Directors breached their duty to BHC by failing to investigate ... the financial statements and information given to the

---

**8.** These elements of negligent misrepresentation are essentially the same in all the jurisdictions that are connected to BHC or Brada. *See Maltz*, 992 F.Supp. at 308 (applying California law); *Steinman v. Levine*, 2002 WL 31761252, at *15 (Del.Ch. Nov.27, 2002); *Citino v. Redevelopment Agency of the City of Hartford*, 51 Conn.App. 262, 721 A.2d 1197, 1206 (1998).

public forums, the Securities and Exchange Commission, and disseminated to BHC . . . ." There is no allegation that Brada, a vice president of Travelers, had any connection with Finantra until after the October 1999 acquisition of Travelers. Count VI does not identify any post-acquisition statements, and does not explain why Brada bears any responsibility for them. The absence of these allegations would result in dismissal of the negligent misrepresentation claim against Brada even if we were to assume that he owed a fiduciary duty to BHC.

Accordingly, I recommend that BHC's negligent misrepresentation claim against Brada be dismissed with prejudice.

### B. *Travelers' Claim against Brada (Count XIII)*

I now turn to the lone claim by Travelers against Brada. This is another claim for breach of a fiduciary duty. This claim is governed by California law, since Travelers was and is a California corporation and its officer Brada was and is a California resident.

Under California law, the elements of a claim for breach of fiduciary duty are (1) the existence of a fiduciary relationship, (2) its breach, and (3) damages proximately caused by that breach. *Dorian v. Harich Tahoe Development,* 1996 WL 925859, at *5 (N.D.Cal. Jan.16, 1996); *Pierce v. Lyman,* 1 Cal.App.4th 1093, 3 Cal.Rptr.2d 236, 240 (1991). A plaintiff must allege all three elements in order to survive a motion to dismiss. *Dorian,* at *5 ("absence of any one of these elements is fatal to the cause of action").

Count XIII reads as follows:

### BREACH OF FIDUCIARY DUTY

### (*TRAVELERS v. ALL DEFENDANTS*)

192. TRAVELERS repeats and realleges each and every allegation con-

tained in the foregoing paragraphs as if fully set forth herein.

193. Defendants owed a fiduciary duty to TRAVELERS because TRAVELERS was a subsidiary of FINANTRA.

194. Defendants breached their fiduciary duty owed to TRAVELERS by, *inter alia,* making and allowing the transfers of TRAVELERS funds and assets to FINANTRA and/or failing to report such illicit transfers.

195. As a direct consequence of the defendants' breach of fiduciary duty, TRAVELERS has not yet learned of the extent of its monetary injury resulting from said actions of defendants. As a result, TRAVELERS has been monetarily damaged in an unknown amount which will be proven at trial but believed to exceed $20 million.

The first element, the existence of a fiduciary relationship between Brada and Travelers, is not shown by Paragraph 193, but it is shown by the incorporated Paragraph 32. As a vice-president of Travelers, Brada owed a fiduciary duty to that corporation. *GAB Business Services, Inc. v. Lindsey & Newsom Claim Services, Inc.,* 83 Cal.App.4th 409, 99 Cal.Rptr.2d 665, 669–73 (2000).

The second element, a breach of this duty, is not shown by Paragraph 194; Travelers has not cited any legal authority for the proposition that its officers would breach a duty to Travelers by making transfers of the funds and assets of Travelers to its sole shareholder Finantra. On the other hand, some of the incorporated Paragraphs allege that funds of TAQ and Travelers were used for the unjust personal benefit of Maynard J. Hellman, Robert D. Press and Barry J. Goldstein. (Am. Compl.¶¶ 70, 105–08.) The problem is that these paragraphs say that those transfers

were caused by Finantra, and not by Brada. Nor is this cured by Paragraph 69's reference to "certain of the TRAVELERS' Officers and Directors." If Travelers were to allege that Brada "knowingly approved and participated in [a] transaction" that gave away assets of Travelers for unfair consideration, then Brada "may be liable for the loss suffered by the corporation even though he personally received no consideration." *Burt v. Irvine Co.*, 237 Cal. App.2d 828, 47 Cal.Rptr. 392, 407 (1965).

It is a close question whether Travelers should be given a third chance to state a claim against Brada for breach of a fiduciary duty. I would give Travelers one last chance, since (unlike BHC) it has shown that Brada owed it a fiduciary duty.

I recommend that Judge Knapp dismiss the claim of Travelers against Brada, without prejudice. This dismissal should be made pursuant to 28 U.S.C. § 1367(c)(3) if Judge Knapp adopts my recommendation to dismiss the federal claims (Counts VII and VIII).

### CONCLUSION

For the foregoing reasons, I recommend that Judge Knapp (1) dismiss Counts VII and VIII as to Litt, Dwyer, and Arthur Press with prejudice, and dismiss the state-law claims as to Litt, Dwyer, and Arthur Press without prejudice; (2) dismiss all the claims against PwC with prejudice, and (3) dismiss BHC's claims against Brada with prejudice, and dismiss Travelers' claim against Brada without prejudice.

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, any party may object to this recommendation within 10 business days after being served with a copy, i.e., by April 26, 2003, by filing written objections with the Clerk of the U.S. District Court and mailing copies of those objections (a) to the opposing party, (b) to the Hon. Whitman Knapp, U.S.D.J. at Room 1201, 40 Centre Street, New York, N.Y. 10007 and (c) to me at Room 1360, 500 Pearl Street, New York, N.Y. 10007. Failure to file objections within the 10 business days will preclude appellate review. *Thomas v. Arn*, 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *Wesolek v. Canadair Ltd.*, 838 F.2d 55, 58 (2d Cir.1988). Any request for an extension of time must be addressed to the District Judge.

Apr. 9, 2003.